## PAUL A. MATHEW, APPELLANT, v. JANE M. PALMER, APPELLEE.

589 N.W. 2d 343

Filed February 9, 1999. No. A-97-196.

Steven J. Lefler, of Lefler & Franklin Law Firm, for appellant.

Erin M. Calkins and Susan A. Anderson, of Anderson Law Office, for appellee.

HANNON and MUES, Judges, and NORTON, District Judge, Retired.

HANNON, Judge.

Paul A. Mathew appeals from a decree dissolving his marriage to Jane M. Palmer. Paul alleges that the trial court erred (1) in dividing the parties' property, specifically, in not including in the marital estate the proceeds realized from a lawsuit for breach of privacy Jane suffered and a separate pending cause of action for damages Jane suffered from medical malpractice; (2) in determining which of the assets or debts of the parties were marital assets and debts; and (3) in determining Paul's interest in the marital estate based on findings that the 13-year marriage was of short duration. We conclude that neither the recovery from the tort proceeds of the privacy action nor the cause of action for malpractice is part of the marital estate and that the trial court erred in determining the parties' marriage was of short duration. Upon a de novo review, we conclude that in view of Paul's indolence over a period of several years, the trial court did not abuse its discretion in its division of the assets and debts of the parties. We therefore affirm.

## I. BACKGROUND

Paul and Jane were married on September 2, 1983, in Omaha, Nebraska. Two children were born of the marriage, Jane Elizabeth, born December 19, 1987; and James, born December 31, 1990. The court awarded Jane custody of both children and awarded Paul reasonable rights of visitation. Paul was ordered to pay child support of $755 per month for both children and $517 when there is one child to be supported, as calculated in a Nebraska Child Support Guidelines worksheet attached to the decree. The court also required Jane to maintain health insurance on the children and ordered each party to pay 50 percent of specified health expenses not covered by insurance and 50 percent of the children's Montessori tuition and

expenses. The court awarded no alimony. None of these provisions of the decree are questioned. All questions raised in this appeal concern the distribution of property.

## II. ASSIGNMENTS OF ERROR

Restated, Paul claims the court erred (1) in finding that the duration of the marriage was short, (2) in determining the value of Paul's contribution to the marital estate, (3) in determining the value of the marital estate, (4) in determining Paul's share of the marital estate, (5) in awarding certain litigation proceeds to Jane, (6) in permitting Jane to "double count" assets out of the marital estate, and (7) in allowing $26,000 of stock to be set off against the marital estate. In essence, Paul alleges the property settlement is unreasonable and unfair. We have organized these assignments into a format that we think will make the issues and our decision clearer.

## III. STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998); *Priest v. Priest*, 251 Neb. 76, 554 N.W.2d 792 (1996); *Reichert v. Reichert*, 246 Neb. 31, 516 N.W.2d 600 (1994). The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. In a de novo review on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Thiltges v. Thiltges*, 247 Neb. 371, 527 N.W.2d 853 (1995).

With respect to questions of law, an appellate court has an obligation to reach a conclusion independent of the determination made by the court below. *Frey v. Blanket Corp.*, 255 Neb. 100, 582 N.W.2d 336 (1998).

 

## IV. ANALYSIS

### 1. Preliminary Considerations

As a preliminary matter, Paul and Jane's marriage lasted 13 years. We are not sure what the trial court meant by its finding that the marriage was of short duration on "a de facto" basis or what effect that finding had on the trial court's division of property. We do not believe the nature of the parties' relationship had anything to do with the duration of the marriage. In our de novo review, this finding of the trial court will be ignored.

Paul also assigns as error the allowance of $26,000 against the Omaha World-Herald stock, which he claims was set off against his share of the marital estate, and the court's permission to "double count assets." The latter point is concerned with the effect the trial court gave to $30,000 that Jane borrowed after the parties separated to distribute to Paul. We are unable to determine how the trial court arrived at what it referred to as the "total marital estate," and therefore, we are not sure what effect the trial court gave the debts of the parties. We will consider the effect of these debts of the parties later in the opinion when we list the assets and determine which debts are marital debts, and in the light of that discussion, we will give those debts the effect we think appropriate. After our de novo determination of a reasonable distribution, we will compare that distribution to the effect of the trial court's distribution. We follow this procedure, because we cannot determine how the trial judge arrived at some of the net values he announced in explaining his decision.

A de novo review on the issue of property division requires a determination of the parties' nonmarital property, the property included in the marital estate, its value, and its distribution. Certain background information will make this evidence easier to follow.

### 2. Personal History of Parties and Their Marriage

Paul and Jane met in 1981 when he was employed by the Leo Daly Co. as general counsel and she had been employed by the Omaha World-Herald newspaper for 8 years. Paul had received a bachelor's degree, a master's degree, and a juris doctorate degree and was a member of the Nebraska State Bar Association. Paul was also a "retired" Naval officer.

The couple was married on September 2, 1983. Paul was 34, and Jane was 37. Shortly after the marriage, Paul quit his job with the Leo Daly Co. because he felt he had better professional opportunities in California. Paul passed the California bar examination and then took a position as an insurance defense attorney in California. While in California, Paul was involved in two legal actions concerning land owned by his father's family. In 1984 and 1985, Jane and Paul lived apart for 15 months while Paul worked in California. Paul returned to Omaha in 1985 and obtained a position with Peter Kiewit Sons', Inc. Paul testified he came back to Nebraska rather than have Jane move to California, because her status as "a key employee" could not be transferred to California. Paul worked for Kiewit from September 1985 until January 1, 1988, when he and three other attorneys were laid off. Paul has not been employed or engaged in a moneymaking business since that time. Paul began receiving counseling for depression in 1988 but testified that he otherwise was in good health. Jane was still employed by the Omaha World-Herald at the time of trial, and her income had steadily increased over the years.

Paul testified that his gainful employment since January 1988 had been a series of lawsuits for his family. Paul testified that he "protected [his] wife and children and served in a variety of functions most men don't ever do." Paul's grandparents had a valuable piece of property in trust, which he found had been abused by the trustee, the Bank of America. On behalf of his family, Paul initiated a suit to recover the loss, but the suit was dismissed for failure to prosecute. Paul was also involved in a malpractice suit against the California attorney who failed to prosecute that action. Ultimately, a settlement was reached, and in the fall of 1993 or spring of 1994, Paul received $96,000 as his share of the loss. Paul testified that he spent a great deal of time and effort on these matters. This $96,000 is treated below as an inheritance of Paul's.

Generally, the parties kept their finances separate. The couple purchased a home in Sarpy County, Nebraska, in 1986. While Paul was employed, he generally made the mortgage payments and paid the utilities. At first, Paul paid these bills using his earnings, and later, he paid them from his inheritance.

Paul testified that he was able to use his savings and his inheritance to maintain the operation of the household for about 3 years. He also liquidated his IRA, pension plans, and investment portfolio. Paul testified that during the years when his "equity" was low, he would borrow against his credit cards, and at the time of the final hearing, his credit card balance was approximately $26,000. In 1991, his credit card debt was almost that much, and Jane withdrew $6,000 from her IRA account to pay on his "consumer debt." The parties also took out a "consolidation loan" of $18,000 to $20,000. (The evidence is unclear as to the exact amount borrowed.) This is one of the loans that encumbered the Omaha World-Herald stock at the time of trial. Jane also paid Paul's credit card debts at other times and paid on these loans, but there is no evidence of the amounts or dates of these actions.

In late 1993 or early 1994, Jane told Paul that she would no longer pay his "charges." The evidence shows that from Paul's credit cards and checks, Jane was able to demonstrate that Paul spent $20,617 in 1994, $9,402 in 1995, and $6,618 in 1996 for personal and luxury items. Jane claims Paul dissipated their resources by spending and credit card charges. She testified that during their marriage, she did not have the money to purchase clothes for the children, furniture, and other household items.

Jane had breast implants a year after the parties were married. The implants ruptured and gave rise to a cause of action for the resulting personal injuries. We shall refer to this suit as the malpractice action. In addition, a doctor published an article in a Minneapolis, Minnesota, newspaper displaying an x ray showing Jane's breast implant problems and identifying Jane by name. This resulted in a lawsuit by Jane against the doctor and the newspaper for what we shall call her privacy action. This action was ultimately settled, and after payment of the attorney fees and expenses, $100,243 remains in two separate accounts at First Bank in Jane's name. Paul maintains both the malpractice action and the settlement proceeds of the privacy action, or a part thereof, are marital property, and Jane disputes this. The trial court found both litigation proceeds were nonmarital property. The issues concerning the recovery or possible recovery from these actions will be considered later in this opinion.

Paul testified that from 1988 until 1993, he did "everything [he] could to keep the house going," such as the shopping, 80 percent of the cooking, and "straightening up" the house. He testified that they had a woman care for their children in their home from 1988 through 1991 so the children would have the care he "didn't know how to give." A cleaning woman came regularly during their marriage, the most recent time period being the 5 years preceding the trial. Jane disputes the amount and value of Paul's domestic service, although she does admit he did some things around the home, such as caring for one of the children for several months. Jane testified that in 1994, she asked Paul to do more, such as transporting the children to school so she would not lose her job. He did so. The trial court found his care of the children was minimal.

The testimony of the cleaning woman and the child-care provider establishes that while not working, Paul did not care for the children, but instead worked in his office or did other things. This testimony establishes that Paul did not interact with the children. It is significant that while Paul was unemployed, Jane still felt it necessary to have a child-care provider, a cleaning woman, and later, to send the children to day care. In summary, the evidence appears to establish that Paul performed many domestic services, but not markedly more than fully employed spouses frequently do and certainly less than would be expected of an unemployed spouse while the other spouse was fully employed.

This action was filed in December 1995. Paul moved to the State of Washington in March 1996 because he felt he needed a new start, had friends there, and felt the area would have significant economic growth. At the time of the hearing, October 21, 1996, he was 47 years of age, but unemployed. Paul is under the care of a psychiatrist and takes antidepressant medication, but did not introduce any medical evidence relative to any mental disability or any handicap. He is a member of the Florida, Nebraska, and California bar associations and had applied for admission to the State of Washington bar, but he was unsuccessful on his first attempt to pass that bar examination. He was working with a career placement service in an attempt to obtain employment, but had had only one interview.

### 3. Litigation and Its Proceeds

The breast implants were performed about a year after the parties were married. After a year or two, Jane developed difficulties, and in 1993, she learned the implants had ruptured. During several years, Jane was often sick. She testified that she felt as though she had the flu for a 4- or 5-year period, and her low point was from 1986 until 1992. Jane continued to work at her same job, but in 1994, her employer indicated concern for her performance at work.

The breast implant action was part of a class action suit, but in 1995, with Paul's encouragement, Jane opted out of that action rather than settle for the amount expected to be realized. Paul testified he believed Jane would ultimately receive more than $500,000 from this claim.

Paul also claims that he successfully fought with Jane's health insurance carrier to have that company pay for the removal of the defective breast implants and is apparently seeking compensation for those services. He also spent time investigating the possibility that their children might have been adversely affected, because they were nursed while the implants were in place.

We shall first consider whether the pending cause of action for malpractice or the proceeds from the privacy action are part of the marital estate.

### (a) Review of Legal Authorities

In *Maricle v. Maricle*, 221 Neb. 552, 378 N.W.2d 855 (1985), the Supreme Court affirmed the inclusion in the marital estate of the proceeds from a personal injury action where the husband had been totally disabled. The *Maricle* court commented that Nebraska was an equitable jurisdiction and that many such jurisdictions consider such proceeds to be within the marital estate. The court concluded that the fund was acquired by neither gift nor inheritance, that it was not established by a third person, and that the fund constituted the primary source of income for the parties. In *Maricle,* the wife received a home, a car, and miscellaneous personal property equal to 36 percent of the marital estate. The husband received machinery and the fund.

In *Parker v. Parker*, 1 Neb. App. 187, 492 N.W.2d 50 (1992), this court included in the marital estate two-thirds of $33,500 that had been recovered by the wife for injuries to her back. This court noted that to obtain the settlement, the husband was required to release his personal claim, but also noted that the wife must endure the pain and suffering in the future.

In *Gibson-Voss v. Voss*, 4 Neb. App. 236, 541 N.W.2d 74 (1995), this court held that a workers' compensation award is marital property only to the extent the award recompensed the couple's loss of income during the marriage. We have been unable to find any further Nebraska cases on the treatment of personal injury damages upon divorce.

The authorities we have consulted, that is, 24 Am. Jur. 2d *Divorce and Separation* § 546 (1998); 3 Family Law and Practice § 37.13 (Arnold H. Rutkin ed., 1998); 2 Valuation & Distribution of Marital Property § 23.08 (1998); and Brett R. Turner, Equitable Distribution of Property § 6.17 (2d ed. 1994), show that there are several approaches used by the various states. One approach is called the *mechanical* approach. This approach includes all personal injury awards in the marital estate. The *Maricle* court stated that Nebraska was an equitable property jurisdiction and that it recognized many such jurisdictions which consider recovery for personal injuries to be included in the marital estate. Our research indicates that Nebraska would be placed in the *mechanical* group by the above-cited authorities.

However, the majority of jurisdictions at the present time are included in what the above authorities call the *analytical* group. The following is a summary of what the above authorities maintain the majority, or analytical approach, concludes:

> Moneys realized by way of settlement or judgment from a tortfeasor as compensation for pain, suffering, disfigurement, disability, or other debilitation of the mind or body, represent personal property of the injured spouse and do not constitute a marital asset, although there is authority to the contrary. . . . But moneys realized in an action for personal injuries for past wages and medical expenses, which diminished the marital estate, are marital assets. Thus, some portion of an award for a personal

injury sustained during the marriage may constitute marital property subject to distribution, and the proper means to determine whether an award, or part of it, is marital property is to ask what the award was intended to replace, not merely to ask how the statute defines marital property.
24 Am. Jur. 2d, *supra*, at 700.

In *Maricle v. Maricle*, 221 Neb. 552, 378 N.W.2d 855 (1985), the injured husband was 32 years old and permanently and totally disabled. The husband obviously suffered a substantial loss of earning, and the court found the fund was the primary asset of the parties. While the opinion does not show any specific recovery by the husband for loss of future earnings, the loss of future earnings would obviously have been included in the recovery for that disability. The husband's permanent disability recovery would obviously have included damages that under the analytical approach would be marital property and damages which would not be marital property. In other words, the fund in *Maricle* would have seemingly included both damages which would have been included in the marital estate and those which would not. Therefore, the decision is consistent with the analytical approach.

In *Parker v. Parker*, 1 Neb. App. 187, 492 N.W.2d 50 (1992), this court actually considered the factors recognized in the above-quoted rule, albeit in slightly different words, and this court included only two-thirds of the personal injury recovery in the marital estate in recognition of the injured wife's personal suffering. In *Gibson-Voss v. Voss*, 4 Neb. App. 236, 541 N.W.2d 74 (1995), this court attempted to analyze the workers' compensation recovery under the principles recognized in the analytical approach, but found the record was inadequate to do so and remanded the cause for further hearing on the subject.

■ We therefore conclude that Nebraska uses the analytical approach as summarized by the above-quoted rule. Thus, compensation for a tortious injury that a spouse has or will receive for pain, suffering, disfigurement, disability, or other debilitations of mind or body are not included in the marital estate, but compensation for past wages, medical expenses, and other items which diminish the marital estate are included within the marital estate. The burden of proof to show that property is non-

marital property is on the person making the claim. *Frost v. Frost*, 227 Neb. 414, 418 N.W.2d 220 (1988). Therefore, Jane had the burden to prove that the recovery from the privacy action and the pending malpractice action were not part of the marital estate.

### (b) Malpractice Action

There is no definitive evidence on the status of the malpractice action or the elements of damage that Jane is seeking to recover in that action. Paul described the effect of the injury on their daily life as far more pronounced than did Jane. Jane testified to having suffered physical discomfort such as swollen lymph nodes and feeling like she had the flu. Sometimes she found caring for her family and her job difficult, but her disability did not cost them any income, and there is no evidence of expenses paid as a result of the injuries. Jane admitted her condition adversely affected her work for a time, but she was not discharged, and she did not think she was less well employed at the time of trial than she would have been without the injury.

Jane maintains Paul has a separate cause of action for loss of consortium. Paul testified to a considerable decrease in Jane's vitality after the operation, but he offered no evidence of Jane's disability or any evidence that Jane's sickness caused financial damage to the marital estate. Jane's evidence established that all injuries she received as a result of the malpractice were pain and discomfort and that her income did not decrease from the injury. There is no evidence that any expenses were incurred in treating the condition or in making up for any inability to work at home. Paul testified that Jane lost her vitality and that her sickness adversely affected her personality. None of this affected the marital estate. Paul's loss due to any decrease in Jane's ability to be an agreeable marriage partner is included within consortium, and that cause of action was assigned to Paul. We therefore find Jane carried her burden and proved that the injuries which resulted in the settlement and the pending malpractice cause of action were personal to Jane and not includable in the marital estate.

### (c) Privacy Action

The breach of privacy action resulted in recovery of $100,243, which still remains in Jane's name. Paul likewise claims an interest in this recovery. The evidence shows that the breach of Jane's privacy caused her considerable embarrassment and humiliation, but there is no evidence that it in any way decreased the marital estate. Under the analytical approach discussed above, the proceeds of this action would clearly be nonmarital property.

### 4. PAUL'S POSSIBLE INTEREST IN TORT RECOVERY DUE TO HIS EFFORTS

Paul also seeks some share or interest in the ultimate recovery from these actions on the basis of his efforts as a lawyer. Since we have determined that the recovery and the claim are nonmarital property, the enhancement of the value of these claims, if any, by Paul's work is analogous to the services performed by a spouse on other nonmarital property acquired by gift and inheritance. Property owned at marriage, inherited, or received by gift is not generally considered part of the marital estate. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997).

> An exception to the rule [often called the *Van Newkirk* exception] applies where both of the spouses have contributed to the improvement or operation of the property which one of the parties owned prior to the marriage or received by way of gift or inheritance, or the spouse not owning the property prior to the marriage or not receiving the inheritance or gift has significantly cared for the property during the marriage.

*Id.* at 213, 570 N.W.2d at 319. In *Tyler,* the court observed that the husband had made various improvements to the nonmarital house but had offered very little evidence on the value of those improvements. The court allowed the husband an interest in the home only to the extent the evidence did show the value of his contributions (improvements). We apply the same rationale here. For Paul to successfully claim an interest in the tort actions and the recovery from them, he must show that at least, the services performed enhanced the value of the nonmarital property. A spouse cannot acquire an interest in the nonmarital

property of the other spouse for services related to that property absent evidence of the value of such services to the nonmarital property of the other spouse.

Paul introduced time records showing that in 1993 and 1994 he spent 212.1 hours working on the breach of privacy suit, and he claims compensation at $100 per hour, plus $1,445.34 for unreimbursed expenses. Paul testified that after 1993, he spent years working with the lawyers representing Jane in an attempt to recover for the injuries resulting from the breast implants and from the privacy action. Paul testified that he conceived the action and accounted for 75 hours of working time on the breach of privacy action, although, in a letter to an attorney in Minnesota, he stated that he probably spent 150 hours working on the suit.

The trial court found that the time records show Paul billed time for consultation with Jane, which the trial court considered improper. The court also found that there was no contract for legal services. We find no evidence in the record that Paul made any formal appearance in any action. He testified he corresponded with the various attorneys concerning litigation. Jane was always represented by other lawyers in both lawsuits, and there is no evidence of the need or value of Paul's services, or what he actually did during the time he spent. Except for the expenses listed on Paul's statement, there is no evidence of any expenses in connection with such claim, such as the amount paid toward the cost of litigation and travel or attorney fees that might have been paid out of the marital estate. The expenses listed on his statement are unexplained. Paul's statement lists his hourly rate of charge for services he claims to have performed, but there is no evidence as to what, if any, results were obtained from Paul's efforts. The evidence shows that other attorneys were hired in connection with both the malpractice action and the privacy action, and the evidence shows that in the privacy action, fees and expenses of more than one-third of the gross recovery were paid by Jane from the recovery. The services Paul listed on the statement were for correspondence, consultation with various people, research, and telephone calls, in much the same manner as any lawyer would list services on a statement to a client. There is no explanation as to the purpose

or need for these services, nor is there any evidence showing what was accomplished by them. Since other attorneys were paid from the privacy action what would usually be regarded as a regular fee and other attorneys were retained in the malpractice action, at best, Paul's efforts seem to be a duplication of the retained attorneys' efforts. There is no evidence that Jane asked Paul to act as a lawyer in connection with her claims, and there is no evidence that his efforts accomplished anything for Jane. We therefore conclude that there is no evidence that the legal services Paul might have performed had a value to Jane's marital property. Thus, the trial court did not abuse its discretion in finding the proceeds or the cause of action to be nonmarital.

### 5. NONMARITAL PROPERTY PAUL HAD OR RECEIVED

Paul brought considerable property into the marriage, but except that which was distributed to him in kind, all such property was disposed of before the decree was entered. For instance, the evidence establishes Paul had retirement and investment accounts totaling $14,870.55 on December 31, 1987, $39,417.86 on December 31, 1988, $34,155.83 on December 31, 1989, only $14,960.45 on December 31, 1990, and nothing thereafter. In addition, Paul received the following cash by gift or inheritance from his family during the marriage:

| | |
|---|---|
| Nontaxable distributions from an estate | $83,501 |
| Taxable distributions from an estate | 18,451 |
| Net of the $96,000 settlement on California property | 65,000 |
| Life insurance policy purchased by mother but sold for living expenses | 4,500 |
| Total | $161,452 |

Such nonmarital property simply was spent by Paul to maintain his standard of living or to pay family expenses he would have paid from earnings, if he had had them.

### 6. NONMARITAL PROPERTY JANE HAD OR RECEIVED

The evidence shows Jane brought an automobile and camera equipment into the marriage, but there is no evidence as to the value of either.

At the time of the marriage, Jane owned 275 shares of Omaha World-Herald stock. (The value of the stock on June 22, 1996,

was $345.32 per share.) The stock account has been increased by purchases during the marriage, and we will allow for the nonmarital stock by subtracting 275 shares from the total number the parties owned at the time of the divorce. The trial court awarded all stock to Jane.

When the couple married, Jane had an Omaha World-Herald pension benefit account, and additional contributions were made to this account over the course of the marriage. Jane's premarital portion is eight-twentieths of the total account, and the balance of twelve-twentieths is listed as marital property below and valued at $16,682. The trial court awarded this pension to Jane.

There is a Kirkpatrick Pettis IRA account with a balance of $57,931.97 from a total investment of $14,000. Jane had $4,000 in the account when they married and invested another $4,000, using nonmarital resources. The trial court determined three-sevenths of the property was nonmarital, and four-sevenths thereof was treated as marital property. The trial court divided the marital portion equally.

The evidence also shows that Jane brought a stock portfolio and a pension plan into the marriage, but the evidence does not show the value of that property at the time of the marriage. However, it was segregated until it was sold, and $4,284 was used to purchase the parties' home, $4,000 was transferred to the Kirkpatrick Pettis account as shown above, and $6,000 was used to pay Paul's credit card debts. Jane also received a small inheritance. It therefore appears that Jane brought $6,000 from her stock portfolio and the $11,252 inheritance into the marriage, which is not traced to other property, for a total of $17,252.

### 7. MARITAL PROPERTY

The trial court found that the marital home of the parties, which was awarded to Jane, had a net value of $48,000 after allowing for Jane's contribution of $4,284 from her stock portfolio toward the purchase of the home. Neither party disputes this finding.

At the time of trial, Jane owned 1,141 shares of Omaha World-Herald stock, but 275 of these shares are nonmarital property as explained above. The evidence shows that Jane's opportunity to purchase this stock was one of the benefits of her employment and that some stock was purchased with money

she borrowed. The evidence shows that the value of this stock was $345.32 per share and that the 866 shares of marital stock had a value of $299,047 at the time of trial. The trial court did not assign a separate value to the stock but included it with other property. We find that we must separate it from other property to determine the value of the marital estate.

Jane requested the trial court deduct 28 percent of the $225,061 increase in the value of the Omaha World-Herald stock over purchase price in arriving at the value of that stock for distribution purposes. Jane testified that she was familiar with income tax rates and that the request was based upon Jane's estimate of the income tax she will have to pay if she sells the stock. The Supreme Court has allowed a deduction in the value of marital property or income tax liability in the case of IRA accounts. See, *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995); *Buche v. Buche*, 228 Neb. 624, 423 N.W.2d 488 (1988). The trial court made no specific finding on this point, and we cannot tell if the court allowed that deduction in valuing the marital estate. However, we find that such a deduction in value for income tax on property which is not due to be sold in the foreseeable future is clearly speculative, and we do not make that deduction. Accordingly, we determine the stock has a gross value of $299,047.

The Omaha World-Herald stock is subject to liens of $29,263.85 for principal and interest as of July 5, 1996, for partial costs of buying the stock, and $23,570 for what the parties have called a consolidation loan. However, we later herein conclude that the $23,570 debt is Paul's obligation, and therefore for purposes of computing the parties' marital estate, we deduct only the $29,263.85 debt from the gross value of the stock. The net value of this stock is therefore $269,783.15.

The Omaha World-Herald stock is the parties' best security for loans, and therefore Jane borrowed money which is secured by a lien on the stock. One loan for $23,570 is referred to above. Jane also borrowed $40,000 to distribute, first $30,000 and then $10,000, to Paul pursuant to the parties' agreement. For purposes of segregating the parties' interest and the division of property, we are treating these debts as nonmarital debts and not deducting them from the stock as a lien. Jane received the stock

and therefore must pay both debts. The debt for $40,000 is a nonmarital debt of Jane's and therefore has no effect on distribution separate from the credit she receives for the $40,000 advanced to Paul. We determine below that the $23,570 debt is a nonmarital debt of Paul's, and since Jane must pay it, she is given credit upon distribution.

Paul's evidence valued the personal and household property each party had in his or her possession and therefore received under the decree, as follows, and Jane did not dispute this evidence: contents of kitchen, $2,000; other household property, $4,360; personal property in State of Washington, $2,242; and computer system, $2,250.

The cash value of life insurance policy No. 30001751 on Jane was $307 and policy No. 30001723 on Paul was worth $348. Jane testified she had a $668 stock dividend she received from the Omaha World-Herald, a check from Paul's life insurance company for $129, and a state tax refund of $98.

The court awarded each party the personal property in his or her possession, but apparently did not value all of that property. We have been unable to arrive at the same figure for the marital estate as the trial court did because we cannot be sure which items the court included to arrive at its value. To determine the reasonableness of the decree, we interpret the decree to have awarded the property as shown in the table below, and upon a de novo review of the evidence, we find the marital property has the value shown on the table below.

## 8. PAUL'S DEBTS

In 1991, the couple took out a "debt consolidation" loan of $18,000 to $20,000 that has grown to $23,570. This loan was obviously to enable Paul to continue his indolent activity. We are not sure, but we believe that this loan is the loan which Paul argues the court erred by making an allowance of $26,000 against the Omaha World-Herald stock. Paul admitted the loan against the stock was in part to pay his credit card debt. We conclude that this loan was made necessary to pay Paul's separately contracted debts, mainly credit cards; that this debt was secured by a lien on the stock because the stock was the only source of funds to pay that debt; and that this loan is properly Paul's nonmarital debt.

The evidence also shows that Paul has the following separate debts: (1) his credit card debt acquired through the marriage of $26,807.89 as of August 7, 1996; (2) his FirstTier Bank debt of $400; and (3) his personal loan from his mother of $11,500. We conclude these debts are likewise Paul's debts and not marital debts. Paul should be ordered to pay them, but since Jane is not going to be required to pay them, no adjustment in distribution is necessary.

We conclude the trial court awarded the parties' marital assets and debts as follows:

## ASSETS AND THEIR VALUES
## DISTRIBUTED TO EACH PARTY

| | Jane | Paul |
|---|---|---|
| **Assets** | | |
| House | $ 48,000.00 | |
| 866 shares of Omaha World-Herald stock | | |
| Value $299,047.00 | | |
| Lien 29,263.85 | | |
| Net value | 269,783.15 | |
| Four-sevenths of Kirkpatrick Pettis | | |
| IRA account | 12,214.00 | $12,214.00 |
| Twelve-twentieths of Jane's pension | 16,682.00 | |
| Personal property in kitchen | 2,000.00 | |
| Other personal property in house | 4,360.00 | |
| Personal property Paul has in | | |
| State of Washington | | 2,242.00 |
| Computer system Paul took | | 2,250.00 |
| Policy No. 30001751 | 307.00 | |
| Policy No. 30001723 | | 348.00 |
| Stock dividend check | 668.00 | |
| Check payable to Paul | | 129.00 |
| State income tax refund | 98.00 | |
| Total value of assets awarded | $354,112.15 | $17,183.00 |
| Marital property less marital debts | | |
| Jane will receive | $354,112.15 | |
| Marital property less marital debts | | |
| Paul will receive | 17,183.00 | |
| Total marital estate | $371,295.15 | |
| Adjustment for Jane's contribution | | |
| to estate | 17,252.00 | |
| Net value of marital estate | $354,043.15 | |

Thirty percent of the net marital estate is $106,212.95.

The adjustment of $17,252 is the amount we determined above to be the value of the property that Jane brought into the marriage and expended for marital purposes. We conclude that the reasonableness of the distribution should take into account such contributions by a party when that property was clearly a benefit to the marital estate.

The trial judge stated he intended to give Paul 30 percent of the marital estate and ordered Jane to pay Paul $35,600 to arrive at that percentage of the marital estate. Because there are debts which we have concluded are Paul's nonmarital debts, we cannot compute the true effect of the distribution ordered by the trial court unless the nonmarital debts of Paul that Jane must pay are subtracted from the value of the marital property Jane will receive, and unless we add to the value of the property Paul will receive the amount of Paul's debts Jane must pay. The same is true of the $17,183 nontraced contribution she made to the marriage. We conclude the comparison should be made as follows:

| | | |
|---|---|---|
| Property Jane receives | | $354,112.15 |
| Less: | | |
| Paul's debt of lien on | | |
| Omaha World-Herald stock | $ 23,270.00 | |
| Sum already disbursed to Paul | 40,000.00 | |
| Contribution to marital estate | 17,252.00 | |
| Payment Jane must make | 35,600.00 | |
| Total adjustment | | 116,122.00 |
| Net value of distribution to Jane | | $237,990.15 |
| Property Paul receives | | $ 17,183.00 |
| Plus: | | |
| Omaha World-Herald debt Paul | | |
| is relieved of | $ 23,270.00 | |
| Sum already delivered to Paul | 40,000.00 | |
| Payments Jane must make | 35,600.00 | |
| Total adjustment | | 98,870.00 |
| Net value of distribution to Paul | | $116,053.00 |
| Net value of marital estate | | $354,043.15 |

The $116,053 is more than the $106,212.95 amount computed above to be 30 percent of the marital estate; therefore, Paul actually received 33 percent of the marital estate as we determine upon our de novo review.

The question is whether the net value of one-third of the net value of the marital estate that Paul received under the decree is reasonable in view of the history of the parties.

We are admonished in Neb. Rev. Stat. § 42-365 (Reissue 1998) that "[w]hile the criteria for reaching a reasonable division of property and a reasonable award of alimony may overlap, the two serve different purposes and are to be considered separately." The statute also provides that the court may order alimony and the "division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities."

The Supreme Court has stated:

As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. [Citations omitted.] Such exceptions include property accumulated and acquired through gift or inheritance, [citation omitted], or property held in trust by a third person, [citation omitted]. Property obtained through one or both spouses' employment, however, is not such an exception.

*Davidson v. Davidson*, 254 Neb. 656, 662-63, 578 N.W.2d 848, 855 (1998) (citing *Chrisp v. Chrisp*, 207 Neb. 348, 299 N.W.2d 162 (1980), and *Shomaker v. Shomaker*, 166 Neb. 164, 88 N.W.2d 221 (1958)).

The trial court obviously had problems awarding Paul a typical share of the marital estate, and the judge stated frankly that the only reason he gave Paul 30 percent of the marital estate was to avoid the appearance the court was dividing the property based on fault.

For child support purposes, the trial court found Paul had an earning capacity of $2,500 per month. His earnings when he was employed, his education, and his experience would certainly support that finding on the part of the trial court. There is no evidence which would support a finding that Paul's earning

capacity has decreased since he lost his job in January 1988. We realize that many couples elect to have one spouse remain unemployed as a homemaker and that with greater frequency, that party is the man, rather than the traditional election for the woman to be the homemaker. We find no evidence that would support a finding the parties had such an arrangement.

 Paul's earning habits since 1988 are significant and must be considered. The Nebraska Supreme Court recently considered the propriety of a division of marital assets and noted that "[b]oth parties were gainfully employed throughout the 20-year marriage and contributed their earnings to the marriage." *Reichert v. Reichert*, 246 Neb. 31, 40, 516 N.W.2d 600, 607 (1994). The Supreme Court has also stated, "[I]n cases where the growth of the marital estate cannot be attributed to one party more than to another, the trial court may divide the estate equally." *Shockley v. Shockley*, 251 Neb. 896, 903, 560 N.W.2d 777, 782 (1997) (*citing Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995), and *Kullbom v. Kullbom*, 209 Neb. 145, 306 N.W.2d 844 (1981)). We think these statements recognize the reciprocal proposition, that is, the division of marital property should take into account when the growth of the marital estate can be traced to one spouse, and the other spouse, through indolence or neglect, chose to make only minimal beneficial contributions to the marriage and was not engaged in activity beneficial to the marriage.

The $170,000 Paul brought into the marriage, and spent, is more of a measure of his indolence than a measure of his contribution to the marriage. Likewise, all of the debts, except that acquired to buy the Omaha World-Herald stock and to buy the home, were incurred to supply Paul with money to maintain his way of life. The property brought into the marriage and the debts he acquired merely enabled Paul to remain unemployed. While employed during the first few years of the marriage, Paul made $50,000 to $60,000 per year plus benefits. Jane testified that when her employer complained about the quality of her work, she confronted Paul and he agreed to transport the children to school. The trial court found Paul's contribution to the marriage and to the care of the children was minimal. We agree. Significantly, the trial court found that "the testimony of Mrs.

Palmer relating to the development of the marital estate is the more credible and probative version" and that "Mr. Mathew's personal career, to the extent it was interrupted, it was interrupted not by the marriage but [by] his own choice."

The evidence shows that Paul did very little to benefit the marriage. Jane worked, largely cared for the children, and managed her income and assets frugally and wisely. The record shows she continued to maintain steady and responsible employment during the marriage, in spite of the fact that she was ill for more than 7 of those years. The trial court found that Jane's efforts were probably responsible for 100 percent of the assets being accumulated. We agree.

 The evidence shows Paul was and is being treated for depression, but there is no evidence to show that the depression contributed to his lack of employment or that he could not have worked in some capacity. We realize that an alteration in the normal distribution of the marital estate to allow for periods of ordinary unemployment is probably not justified, but at some point, prolonged, unexplained unemployment of a spouse must be considered in evaluating the contributions of that unemployed spouse to the marital estate. This is particularly so when the unemployed spouse's efforts are so abysmal compared to the efforts of the other spouse.

In view of the above, we conclude that the $170,000, which Paul either had when the parties married or received by gift or inheritance during the marriage, was not a contribution to the marriage, because Paul spent it for his own purposes. In view of the above, we conclude that Paul's current credit card balance of approximately $26,000 and his debt to his mother and to FirsTier Bank are not debts of the marriage, but, rather, are Paul's personal debts. We also conclude the debt of $23,570, which is a lien on the Omaha World-Herald stock, should also be treated as Paul's personal debt.

## V. CONCLUSION

We are unable to justify some of the conclusory findings of the trial court as to the value of the marital estate. Primarily, we are unable to tell which property the court considered in the values it found. However, upon our de novo review in which we

determined which property or debts should be considered marital property or marital debts and the value of the marital property, we conclude that the effect of the trial court's distribution is not unreasonable and that the trial court did not abuse its discretion in distributing the parties' property and debts. We therefore affirm.

AFFIRMED.