782 N.W.2d 607 (2010)
18 Neb. App. 363
Susan Kaye THOMPSON, appellant,
v.
Gary Dean THOMPSON, appellee.
No. A-09-612.
Court of Appeals of Nebraska.
May 11, 2010.
*611 Stephanie Weber Milone, Omaha, for appellant.
Michael B. Lustgarten, Omaha, and Justin A. Roberts, of Lustgarten & Roberts, P.C., L.L.O., Omaha, for appellee.
INBODY, Chief Judge, and SIEVERS and CASSEL, Judges.
SIEVERS, Judge.

FACTUAL BACKGROUND
Susan Kaye Thompson and Gary Dean Thompson were married January 2, 1987, and two children were born of the marriage, one of whom, Sarah Jane Thompson, remained a minor at the time of trial, at age 17. The parties separated on August 1, 2006, and Sarah continued to live with Susan in the family home. Gary lived in a number of apartments thereafter with the parties' older daughter, who attended college and worked. The older daughter reached the age of majority in May 2007. Susan did not pay support to Gary for the older daughter, nor did Gary pay support to Susan for Sarah either after the separation or during the pendency of this dissolution action. Gary's contact with Sarah following the parties' separation was extremely limited, and the parties stipulated at trial that Gary's parenting time with Sarah would be at Sarah's discretion.
At the time of trial, Susan was 55 years of age and without health problems. Susan's education consisted of an associate degree in business management, and she had been employed for 25 years with Commercial Federal Bank, which later became Bank of the West. Her job was operations manager of the consumer lending division. Susan's earnings were approximately $55,000 gross per year. After the trial was completed, but before the entry of the decree, Susan was notified by her employer that she was being laid off effective June 1, 2009. She filed a motion to reopen the evidence and introduce evidence of such pending layoff, but that motion was denied by the trial court, which reasoned that such fact could be addressed via a modification proceeding.
At the time of trial, Gary was 54 years of age and living alone. Gary's education *612 consisted of several associate degrees and a bachelor's degree, and he had largely completed the work for a master's degree, but had not actually received the degree. During the parties' marriage, Gary worked at a variety of jobs, including being self-employed doing home improvements and repair. He worked doing consulting for ConAgra, he worked for Oriental Trading Company, and he worked as a property manager. Additionally, Gary had been in the military for approximately 28 years, with his service ending in March 1999.
Susan testified that during the course of the marriage, Gary incurred substantial debt, often without her knowledge, and that the parties were required on a number of occasions to take second mortgages on their home, but that at the time of trial, all of the second mortgages had been paid off. Susan asserts that Gary had been a "spendthrift" during the marriage.
The parties agreed that 70 percent of Gary's military retirement was accumulated prior to their marriage, and they agreed to divide the marital portion, 30 percent, equally; thus, Susan's portion of the military retirement was 15 percent. In 2005, Gary decided to work on a Web-based business from his home due to his health problems. Gary's testimony at trial was that he was disabled from engaging in gainful employment and that after July 2007, he had not done any work that generated income. In February 2006, Gary had applied for Social Security disability benefits because he considered himself totally disabled at that time due to severe anxiety, major depression, short-term memory loss, carpal tunnel "trigger lock," heart palpitations, and knee problems. Gary introduced into evidence certified records from the Department of Veterans Affairs (VA), which had determined that he was permanently and totally disabled. Because of such award of VA disability, Gary elected to withdraw his Social Security disability application and take VA benefits. Gary's VA benefits as of trial were $985 per month, medical care, and some benefits to be paid on behalf of his children. Sarah's benefits were to start retroactively from December 1, 2007, but the VA had not made a determination of the benefits Sarah would receive as a consequence of Gary's disabled status.
Such additional facts as are necessary to resolve the assignments of error will be set forth in our analysis section.

PROCEDURAL BACKGROUND
The trial was held on October 8, 2008, and January 5, 2009, and the trial court issued a letter with its findings dated January 16, 2009. On March 11, Gary filed a motion with the court, asking it to clarify certain rulings in its January 16 letter. A hearing was held April 10 on Gary's motion to clarify the rulings, and the court determined that Gary's child support obligation was $118 per month, which was to begin the first full month following the entry of the decree. The trial court also ordered Gary to sign authorizations giving Susan access to information about the VA benefits for the children. Also, on April 8, Susan asked the court to reopen the evidence because of her discovery of a Centris Federal Credit Union account that she alleged she was unaware of until after the trial.
On May 1, 2009, the trial court filed its order on Gary's motion for clarification and the other pending motions. On May 20, Susan filed a second motion to reopen the evidence, alleging that she had been notified the previous day that she was being laid off from her employment, effective June 1. The trial court denied Susan's motion, indicating that the proper procedure for modifying a decree was to file an application to modify, although a decree *613 had not yet been entered. The decree of dissolution, which was issued on May 22, largely followed the January 16 decision letter.

DISTRICT COURT DECREE OF DISSOLUTION
The district court's decree of dissolution of marriage was entered on May 22, 2009. That decree dissolved the marriage and awarded legal and physical custody of the parties' remaining minor child, Sarah, to Susan, subject to Gary's parenting time as arranged with Sarah. The decree further provided:
 Gary was found "legally disabled" and his child support was set at $118 per month, but such obligation was ordered to be credited, dollar for dollar, by any VA benefits payable to Sarah. Any VA benefits payable to Sarah for the time prior to the start date of Gary's child support obligations were payable directly to Sarah and not to be credited against Gary's child support obligation.
 Susan was to maintain health and dental coverage on Sarah as long as such coverage was available through her employment. Susan was further ordered to maintain health and dental insurance on Gary for 6 months following the entry of the decree, if such was available through her employment.
 "As a result of [Gary's] disability," Susan was solely responsible for noncovered medical and dental expenses for Sarah.
 The trial court found that the marital estate should be divided pursuant to exhibit 62, finding the division proposed therein to be fair and reasonable and further finding that the values contained therein were supported by the evidence offered at trial.
 Susan was awarded the marital real estate (equity found to be $89,923), household goods, miscellaneous personal property valued at $5,000, and 15 percent of Gary's military pension (monthly annuity).
 Gary was awarded the coin collection (valued at $6,500), personal property in storage (valued at $5,000), and the balance (85 percent) of his military pension.
 Gary was awarded a lien in the sum of $40,000 against the real estate awarded to Susan, to be paid within 90 days from the date of entry of the decree.
 Susan's 401K account (valued at $234,366 at the time of trial) was to be divided equally, with a valuation date being set as of the date of the entry of decree. Any gains or losses from the date of the decree to the date of the distribution were to be divided equally between the parties, and an appropriate qualified domestic relations order (QDRO) "shall be prepared to effectuate the equal division of [Susan's] 401(k) retirement account."
 Gary was ordered to pay credit card debts in his name that had a combined balance of $25,657 as of the parties' separation in August 2006.
 Gary was ordered to pay the Centris Federal Credit Union overdraft protection accounts ending in the numbers 937-8, 937-9, and 218-8. The record indicates that the total owed on all three accounts was $662.81.
 The court attached to the decree an exhibit showing the debts Gary was ordered to pay, which totaled $78,034.83.
 Susan was ordered to pay alimony to Gary in the amount of $300 per month beginning on the first day of the month following the entry of the decree and similarly each month thereafter until Gary is no longer disabled, reaches age 60, or remarries, or upon the death of either party, whichever occurs first.
 Susan was ordered to pay $3,000 toward Gary's attorney fees.

*614 ASSIGNMENTS OF ERROR
Susan assigns, consolidated and restated, the following errors by the trial court: (1) failing to use Gary's earning capacity as the basis for child support and crediting Gary's VA disability benefits against his child support obligation; (2) abusing its discretion in its division of property in the following respects: (a) the value attributed to the family residence, (b) ordering Susan to pay Gary a $40,000 lien within 90 days, (c) failing to dispose of the asset known as Icon Mountain, Inc., (d) awarding Gary the coin collection when it had already been disposed of, (e) awarding items "in storage" to Gary that had been disposed of, and (f) awarding Gary 50 percent of Susan's 401K even though he was a "spendthrift" throughout the parties' marriage and failed to contribute to the accumulation of the marital estate; (3) failing to employ language in the decree sufficient to accomplish the award to Susan of 15 percent of Gary's military retirement; (4) ordering Susan to pay Gary alimony; (5) ordering Susan to continue to pay for Gary's health insurance during the interlocutory period even though he has health care benefits available through the VA; (6) ordering Susan to pay $3,000 toward Gary's attorney fees; (7) ordering a parenting plan which the parties had not agreed upon; and (8) not allowing Susan to reopen the evidence regarding her posttrial but predecree lay-off from employment.

STANDARD OF REVIEW
In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. Sitz v. Sitz, 275 Neb. 832, 749 N.W.2d 470 (2008).

ANALYSIS

Motion to Reopen Evidence.
Because Susan's last assignment of error, that the trial court should have allowed the reopening of the evidence, would necessarily require a remand to the trial court if we sustained such assignment, we discuss it first. After the trial evidence was completed and the trial court had outlined its intended decision via a letter ruling, but before a decree of dissolution was actually entered, Susan filed a motion on May 20, 2009, to reopen the evidence. The basis for such, as shown by the evidence introduced concerning the motion, was that on May 19, she had received a letter from her employer, Bank of the West, indicating that she would be laid off effective June 1 due to economic conditions. The trial court denied the motion, reasoning that such matter would be more properly taken up in a motion to modify the decree. The rule is that the reopening of a case to receive additional evidence is a matter within the discretion of the district court and will not be disturbed on appeal in the absence of an abuse of that discretion. Myhra v. Myhra, 16 Neb.App. 920, 756 N.W.2d 528 (2008); Jessen v. DeFord, 3 Neb.App. 940, 536 N.W.2d 68 (1995).
The termination letter references a future event, albeit said to occur in the very near future. Thus, whether the termination would come to pass would be somewhat speculative. Moreover, although Susan was earning a net of $3,626 per month, the letter does state that she "will be eligible for severance" pursuant to the company's "Severance Plan." No evidence was introduced about the value of such severance, but given that Susan was a 25-year employee, the inference is reasonable *615 that she would not be immediately without resources and that such severance could affect a modification of the decree based on the potential loss of her job. Finally, as a long-time employee who was the operations manager in the consumer lending division, Susan would clearly have substantial experience and skills, and evidence about job replacement and the marketability of her skills and experience after a termination would enable the trial court to more accurately assess how the termination would affect the financial obligations that the decree imposed on her. For these reasons, we cannot say the trial court abused its discretion in denying the motion to reopen the evidence. However, we find that in the event a motion to modify because of Susan's loss of her job at Bank of the West is filed (or has been filed), such change shall not be deemed a change that was in contemplation of, or anticipated by, the parties.

Gary's Earning Capacity and VA Benefits.
Susan's attack on the trial court's imposition of a $118-per-month child support obligation for Sarah is multifaceted. She argues that the court should have used Gary's "earning capacity," that the record lacks evidence to support the court's finding that Gary is "`legally disabled'" from gainful employment, and that the trial court lacks jurisdiction to give Gary credit against his child support obligation, because federal law prohibits state courts "from exercising subject matter jurisdiction over [VA] disability benefits." Brief for appellant at 18. Susan cites Ryan v. Ryan, 257 Neb. 682, 600 N.W.2d 739 (1999), for the jurisdictional argument. Ryan is not really on point, because it involved a denial by the trial court of the wife's attempt to receive a portion of the husband's VA disability pension as part of the division of marital property. The Nebraska Supreme Court held that Nebraska courts lack jurisdiction to divide the VA disability income, because such is not divisible marital property under the federal Uniformed Services Former Spouses' Protection Act. The Ryan court, referencing the decision in Mansell v. Mansell, 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989), held:
The Court concluded that the [Uniformed Services Former Spouses' Protection Act] had a preemptive effect of its own and held that "the Former Spouses' Protection Act does not grant state courts the power to treat as property divisible upon divorce military retirement pay that has been waived to receive [VA] disability benefits." 490 U.S. at 594-95, 109 S.Ct. 2023.
257 Neb. at 690-91, 600 N.W.2d at 745. Thus, Ryan does not directly address what the trial court did in this case, which was to order that "[Gary's] monthly child support obligation shall be credited, dollar for dollar, by any [VA] Benefits payable to [Sarah]" and that the credit would continue as long as Gary's child support obligation remains in effect. However, under the trial court's decree, any VA benefits payable for Sarah prior to the time that Gary's child support obligation began (June 1, 2009) would be payable directly to Sarah and not credited to Gary's obligation. Therefore, the Ryan decision, while excluding VA disability benefits from the divisible marital estate, is not on point on the question of whether a child support obligor can be awarded credit against the child support obligation from the obligor's VA disability pension. Thus, Susan's reliance on Ryan is misplaced. That said, we have not found any Nebraska authority which directly addresses this precise issue.
However, in Duke v. Richards, 215 W.Va. 470, 600 S.E.2d 182 (2004), the court concluded that the father was entitled to *616 credit against his current child support obligation for payments made by the VA to the child as a result of the father's disability and that the family court erred in holding otherwise. The West Virginia court reasoned that such benefits should properly be regarded as a substitute for current support payments from the obligor's own earnings. In other words, the obligor is entitled to a credit against his or her current support obligation for those payments in a manner similar to that specified in the statute governing the application of Social Security benefits to such obligations. Id. Other courts have permitted a credit on the ground that the federal benefits received on behalf of the children are merely a substitute for the wages the obligor would have received but for the fact of disability or retirement, and from which support payments would have otherwise been received. See, Davis v. Davis, 141 Vt. 398, 449 A.2d 947 (1982); Binns v. Maddox, 57 Ala.App. 230, 327 So.2d 726 (1976). We note that our Supreme Court used a virtually identical rationale in Hanthorn v. Hanthorn, 236 Neb. 225, 460 N.W.2d 650 (1990), when the court held that Social Security payments made to a parent's child on account of the parent's disability should be considered as credits toward the parent's court-ordered support obligation, in the absence of circumstances making the allowance of such a credit inequitable. See, also, Tash v. Tash, 353 N.J.Super. 94, 801 A.2d 436 (2002) (if non-means-tested benefits are paid to or for dependent child for whom support is being determined, benefits must be deducted from basic support obligation). Therefore, we conclude that the trial court did have jurisdiction to award a credit against child support for VA benefits paid to the minor child.
We now turn to Susan's claim that the trial court erred in its calculation of child support, because, summarized, Gary is simply not disabled, he produced insufficient evidence of such disability, and his earning capacity should be used to set child support. Against those claims, we note that the parties' joint tax returns show that in 2003, Gary earned $17,426 from his maintenance and repair business; that in 2004, that business had a net loss of $7,361; that in 2005, the net loss was $962; and that in 2006, the net loss was $9,281. In 2007, the parties filed separately and Gary reported a loss of $16,941 (from three different businessesWeb marketing services, maintenance and repair, and resale of coins and currency). Thus, it can hardly be said that in recent years, Gary has actually had much earning capacity. Additionally, on May 22, 2008, the VA acted on his claim for disability filed November 15, 2007, by granting him a "nonservice-connected pension." The VA decision letter states: "The evidence shows that you have disabilities, to include major depression, right [and] left upper extremity carpal tunnel syndrome and hypertension, which prevent you from working. . . . [W]e consider you to be permanently and totally disabled." The monthly benefit awarded was $931which had apparently increased as of the time of trial to $985. Susan's argument suffers from the failure to tell us what Gary's monthly earning capacity might be in the face of the evidence we have just detailed, including his lack of earning in recent years. Accordingly, we reject the assignment of error that the trial court should have used some figure for Gary's earnings other than his VA disability, and we reject the claim that the trial court erred by giving Gary credit for the VA benefits that Sarah receives after June 1, 2009, when his child support obligation begins.

Valuation and Division of Family Residence.
Susan assigns error to the trial court's valuation of the family residence. *617 The trial court used the figure of $122,000 from a licensed appraiser hired by Gary, resulting in equity of $89,923. She also complains of the trial court's order that she pay Gary a $40,000 lien on the residence, as property division, within 90 days of the date of the decree.
Susan finds fault with Gary's appraisal, because the appraiser has been used 50 to 75 times in the past by Gary's attorney, the appraiser acknowledged limited recent sales in that particular subdivision, the basement was only partially remodeled, and there was a leakage problem in the master bedroom, causing its use to be limited. However, these matters simply go to the weight a fact finder would give to the appraisal.
In contrast, Susan, calling on her experience in the lending division of Bank of the West, valued the real estate at $95,000, or $27,000 less. Susan then argues that expert opinions are not binding on the trial court, citing Anania v. Anania, 6 Neb.App. 572, 576 N.W.2d 830 (1998), a general proposition which we certainly agree with and frequently cite. Susan then concludes that "the trial court abused its discretion in not utilizing Susan's value for the real estate," brief for appellant at 22, a conclusion that seems facially at odds with the authority she cites. In any event, we have reviewed the appraisal done by the licensed appraiser, who does appraisals of predominantly residential real estate. The appraisal is comprehensively done in a standard format with comparables. Susan, as an owner of the property, is certainly entitled to express her opinion as to the value of the residence, and she has valuable work experience giving her a knowledge level beyond that of the average homeowner. Thus, the trial court likely could have used her valuation without error, but the trial court obviously was not required to accept her opinion. The trial court made a reasonable choice between competing valuations, and there is no basis to find error in the acceptance of the licensed appraiser's opinion of the value of the marital residence.
With respect to the court's order that Susan pay Gary the $40,000 lien imposed on the property within 90 days of the decree, we note that the ratio of equity to value is 73 percent. Accordingly, given the substantial equity in the home, it is not inequitable that Gary promptly receive his share of the home, and we assume that the trial court operated on the basis that Susan would be able to refinance the house to secure the funds to pay the lien. Susan argues that Gary's appraisal would not support a loan from her employer and that she "likely would not qualify to refinance the home loan," brief for appellant at 23, given that she had been laid off from her job. As to the effect of the alleged layoff, we have already upheld the trial court's rejection of Susan's motion to reopen the evidence to prove up on the layoff. Thus, we cannot consider that she might now be laid off from her job and the impact such occurrence would have on her ability to secure funds to pay off the $40,000 lien. However, we conclude, as we did earlier, that such alleged layoff shall not be considered as an event that was in contemplation of, or anticipated by, the parties, in the event of a future contempt proceeding or other enforcement proceeding with respect to Susan's payment of the lien. We find no error in the trial court's valuation of the marital residence, or the terms of the payoff of the lien.

Treatment of Icon Mountain, Inc.
Susan alleges that the trial court erred in failing to dispose of an "asset," a company entitled "Icon Mountain, Inc.," which Gary described as "active." However, his testimony about such was that while *618 he had renewed the Internet domain name, applied for the corporate name, and paid the fees in 2006, "nothing else has been done with the corporation" and that it exists "[i]n name only." Susan does not argue that it has any value, but only error by the trial court in "failing to dispose of th[is] asset." The evidence makes it debatable as to whether this is even an "asset," but it is true the decree is silent as to such. Using our de novo review power, we simply award all right, title, and interest in Icon Mountain to Gary, but we assign it no value, given the complete lack of evidence that it has any value.

Coin Collection and Items in Storage.
Susan argues that the trial court erred in awarding Gary the coin collection at an equity value of $6,500, because it does not exist. The evidence shows that Gary gave possession of it to his son, who had loaned Gary money, and that the son sold it for $6,500 and kept the money. After citing some authority concerning dissipation of marital assets, Susan argues: "Thus, while the trial court should have included a value for the coin collection and included the same as a marital asset in its division of property, it erred in awarding the actual asset to Gary." Brief for appellant at 24. While we could understand if Gary were complaining about being given an asset that did not exist and having such count as part of his share of the marital property, we simply do not understand Susan's argument or, for that matter, why she cares that the trial court put an asset on Gary's side of the property division ledger that does not exist any longer. If anyone got the "short end of the stick" with respect to the coin collection, it is Gary, not Susan, assuming that it is now "gone" as Gary testified; but if it still exists, the fact that Gary was awarded it is not inequitableunless it is worth more than the $6,500 value Gary assigned to itbut Susan offered no proof of such fact. Thus, we find this assignment of error to be meritless.
The same argument is advanced with respect to $5,000 worth of personal items Gary had in storage that were lost to the storage facility because he did not pay his rent. The storage items were awarded to Gary by the trial court at a value of $5,000. Again, we do not comprehend how Susan was harmed by the trial court's action, and we likewise find this assignment of error to be meritless.
We note that if these two allegedly nonexistent assets were simply backed out of Gary's property division award, as Susan apparently wants us to do, Gary's award would drop from $143,026 to $131,526, while Susan's award would stay the same at $172,106, meaning Gary's percentage of the marital estate would drop from 45.4 percent to 43.3 percent, but as said, Gary is not complaining, and Susan's complaint is without merit.

Division of Susan's 401K Plan.
Susan had accumulated a 401K plan that was valued at $234,366 as of September 15, 2008, and it was this value that was in Gary's proposed property division, exhibit 62, which the trial court adopted. The trial court ordered that the 401K be divided equally between the parties "with a valuation date being set as the date of the entry of the Decree" and, further, that any "gains/losses from the date of the Decree to the date of distribution" be divided equally between the parties. The decree ordered that a QDRO be prepared to effectuate the division.
Susan asserts that Gary made "little contribution" to the marital estate, repeatedly quit jobs, and repeatedly ran up substantial debt, thus dissipating resources, and that her contributions to the accumulation of the marital estate were *619 vastly more substantial than Gary's. Brief for appellant at 25. Thus, she claims that an equal division of her 401K was error, citing Mathew v. Palmer, 8 Neb.App. 128, 589 N.W.2d 343 (1999). Susan makes no claim that her 401K was not accumulated during the marriage, and thus she tacitly admits that it was properly included in the marital estatebut argues that an equal division of it is unfair and inequitable. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate. Heald v. Heald, 259 Neb. 604, 611 N.W.2d 598 (2000). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. Id.
In Mathew, the evidence was that while the wife worked steadily plus carried much of the load in caring for the children, the husband was "indolent." 8 Neb.App. at 144, 589 N.W.2d at 354. In that opinion, we said:
The Nebraska Supreme Court recently considered the propriety of a division of marital assets and noted that "[b]oth parties were gainfully employed throughout the 20-year marriage and contributed their earnings to the marriage." Reichert v. Reichert, 246 Neb. 31, 40, 516 N.W.2d 600, 607 (1994). The Supreme Court has also stated, "[I]n cases where the growth of the marital estate cannot be attributed to one party more than to another, the trial court may divide the estate equally." Shockley v. Shockley, 251 Neb. 896, 903, 560 N.W.2d 777, 782 (1997) (citing Jirkovsky v. Jirkovsky, 247 Neb. 141, 525 N.W.2d 615 (1995), and Kullbom v. Kullbom, 209 Neb. 145, 306 N.W.2d 844 (1981)). We think these statements recognize the reciprocal proposition, that is, the division of marital property should take into account when the growth of the marital estate can be traced to one spouse, and the other spouse, through indolence or neglect, chose to make only minimal beneficial contributions to the marriage and was not engaged in activity beneficial to the marriage.
Id. at 148, 589 N.W.2d at 356.
In the instant case, the parties were married over 19 years before they separated in August 2006, and it is only Susan who has a retirement account. Gary's Social Security earnings record shows that during those 19 years, Gary had "taxed social security earnings" of $436,275, or average taxed yearly earnings of $22,962 for those 19 years. The husband's contributions to the marriage in Mathew v. Palmer, supra, generated adjectives in our opinion such as "indolent," "abysmal," and "minimal." The evidence about Gary's work history, including service in the National Guard during approximately 12 years of the marriage, cannot be seen as comparable to the husband's history in Mathew. Nonetheless, Gary's work history is not comparable to Susan's record, because she was the steady and substantial contributor to the economic status of the union. Gary changed jobs frequently and engaged in a series of less-than-successful business ventures, particularly after the parties separated on August 1, 2006.
The parties have only two assets of consequence: approximately $90,000 of equity in the marital residence and Susan's 401K, the value of which has gone up and down during the parties' lengthy separation and during the pendency of this action. The value adopted by the trial court via exhibit 62 for the 401K was $234,366, and we use that value for analytic purposes, recognizing that at this point in time, it could be quite different given stock market fluctuations.
*620 The existence of the substantial 401K is due solely to Susan's steadfast work at the same job during the entirety of the marriage. Moreover, the parties indisputably separated and lived separate lives beginning August 1, 2006 (personally and financially), and while Gary's employment and earnings thereafter were sporadic and of little consequence, Susan continued to be fully employed. And the evidence shows that Susan's contributions to her 401K, including the company match, were at the approximate rate of $1,500 per quarter. Thus, between the date the parties' marriage had ended for all practical purposes and the date of the decree, Susan would have had an additional 11 or 12 quarters of contributions to her account at the rate of approximately $1,500 per quarter. During this same time, Gary was largely unemployed and living on credit cards. Thus, an equal division of this account gives Gary the benefit of her additional contributions after the separation and ignores the substantial disparity between the economic contributions of the parties to the accumulation of the marital estate. Therefore, we find that an award of 50 percent of the 401K to Gary is not reasonable, or equitable, and was an abuse of discretion. We therefore modify the property division to provide that Gary shall be awarded 33 percent of the total value of Susan's 401K account. See Ragains v. Ragains, 204 Neb. 50, 281 N.W.2d 516 (1979) (property division should generally vary from one-third to one-half value of property involved, depending upon facts and circumstances of particular case).
The trial court used the date of the decree (May 22, 2009) as the date of valuation and provided: "Any gains/losses from the date of the Decree to the date of distribution of the retirement account shall be divided equally between the parties." There is, of course, no evidence as to the value of the 401K as of the date of the decree, which is somewhat problematic, but no error was assigned to this valuation date. The most current evidence about the 401K is that, as of January 2, 2009, the account had a value of $183,017.16 invested in eight different mutual funds. The provision in the decree dividing "gains/losses," as quoted above, implies that Gary was to receive, via the QDRO, 50 percent of the shares held in each mutual fund within the 401K as of the date of the decree. We believe that implied notion for division is appropriate, but we think it wise to make it explicit, as outlined below.
The trial court shall promptly enter the necessary QDRO, within 30 days of the date of the issuance of our mandate, if possible, and may call upon counsel's assistance in accomplishing the entry of the QDRO. See, Klimek v. Klimek, 18 Neb. App. 82, 775 N.W.2d 444 (2009); Fry v. Fry, 18 Neb.App. 75, 775 N.W.2d 438 (2009). Because of the unknown value of the account on May 22, 2009, as well as how the value of the account was allocated among various investment options available in Susan's plan, the district court may exercise its equitable powers to receive evidence regarding the composition of the account and value of such assets of the 401K both at the date of entry of decree and at the date of any hearing for purposes of issuance of the QDRO. The purpose of doing such would be to allow the trial court to enter an appropriate QDRO specifically dividing the assets of the account such that Susan receives two-thirds of the value of the 401K as of the date of decree, as adjusted for two-thirds of any gains or losses realized thereafter in the account and Gary receives the remaining one-third of the value, again adjusted for gains or losses after May 22, 2009. Of course, any withdrawals Susan may have taken from the account during such time *621 would be allocated toward her two-thirds share of the account.

Award of Alimony.
Susan argues that the trial court erred in requiring her to pay Gary $300 per month in alimony beginning June 1, 2009, and continuing until Gary reaches age 60, he is no longer disabled, he remarries, or either party dies, whichever occurs first. At the time of trial, Gary said he was 54 years of age. Thus, the award is roughly $21,600 over 6 years. The trial court made factual findings in support of the alimony award, reciting the duration of the marriage, the history of contributions to the marriage, Gary's disability, his living expenses, Susan's monthly earnings, and her expenses. Susan argues that the alimony award was error because "the record does not reflect he is disabled from employment, reflects he has earning capacity,. . . reflects he has been [a] spendthrift. . . and reflects Susan was laid off from her job." Brief for appellant at 26-27. The last reason cannot be considered at this juncture, because such fact is not in evidence. And while the evidence shows that Gary was not as economically productive as Susan during the marriage, and that his self-employment businesses in later years were not successful, there is little, if any, evidence to show that he wasted money on bad habits or personal indulgences. In this regard, we note that although Susan testified about the three second mortgages that were taken out because of Gary's shortcomings, the evidence is that as of trial, all of such have been paid, and Susan admitted that Gary always gave her money to apply to the second mortgages. Accordingly, we do not believe that such evidence is really convincing proof that Gary wasted the parties' assets. In short, Susan's "spendthrift" characterization of Gary finds little support in the evidence.
In response to Susan's claim that the alimony award was error, Gary points to Susan's long and stable career in which she was earning in excess of $50,000 per year, in contrast to his permanent and total disability status, which generates less than $12,000 a year in income for him, plus his lack of earnings since 2007. He directs us to Kalkowski v. Kalkowski, 258 Neb. 1035, 1044, 607 N.W.2d 517, 525 (2000), where the court said:
In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.. . . In determining whether alimony should be awarded, in what amount, and over what period of time, the ultimate criterion is one of reasonableness.. . . The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. . . . Factors which should be considered by a court in determining alimony include: (1) the circumstances of the parties; (2) the duration of the marriage; (3) the history of contributions to the marriage, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities; and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.
(Citations omitted.)
Gary introduced an exhibit showing monthly living expenses of $2,277, of which *622 $1,454 was debt service on his credit cards. Otherwise, his monthly expenses are moderatefor example, $200 for food. In contrast, at the time of trial, Susan was netting $3,627, her mortgage payment was only about $700 per month, and she has no other debt. Susan describes herself as healthy, and the remaining minor child was born in 1991 and therefore does not interfere with Susan's employment or ability to work. Thus, given the evidence and our standard of review, we cannot say that the trial court abused its discretion in the award of alimony.

Is Trial Court's Decree Sufficient to Award Susan 15 Percent of Gary's Military Retirement?
Susan argues that the district court erred in failing to employ language in the decree sufficient to accomplish the award to Susan of 15 percent of Gary's military retirement. In order for the award to be enforceable under the Uniformed Services Former Spouses' Protection Act, the award must be expressed either as a fixed dollar amount or as a percentage of disposable retired pay. 10 U.S.C. § 1408(a)(2)(C) (2006).
In its decree, the district court ordered as follows:
5. DIVISION OF THE MARITAL ESTATE: The Court finds that [Gary's] proposed division of the marital estate as set forth in Exhibit # 62 is fair and equitable and the values contained therein are supported by the evidence offered at trial.
. . . .
Pursuant to Exhibit # 62, [Gary] is awarded all right, title, and interest in and to the coin collection (equity value $6500.00); personal property items in storage (equity value $5000.00); remaining portion of his military Pension after 15% transfer to [Susan] (monthly annuity).

(Emphasis supplied.)
Although the intent of the decree is clearthat Susan is to receive 15 percent of Gary's military pensionthis portion of the award could have been set forth more precisely. To avoid any confusion, we modify the above italicized portion of the decree as follows: Susan is awarded 15 percent of Gary's military pension, and Gary is awarded the remaining 85 percent of his military pension. Our research indicates that an award in a divorce decree specifying the percentage of military retirement pay each spouse is to receive is sufficient and that a QDRO is not required.

Did Trial Court Err in Requiring Susan to Continue to Pay for Gary's Health Insurance During Interlocutory Period?
Susan argues that the district court erred in ordering her to pay for Gary's health insurance during the interlocutory period. Susan testified that providing health insurance for Gary costs her an additional $100 per month. Gary testified that because of his disability, he is 100 percent covered by the VA for his health care and prescriptions, but "as long as I'm insured [through other means,] they're gonna take whatever insurance I can collect to keep the cost down for the system." Based on the testimony of the parties, the district court abused its discretion in ordering Susan to continue to pay for Gary's health insurance during the interlocutory periodat an additional cost to her of $100 per monthwhen Gary is able to receive free health insurance from the VA. Thus, we reverse and vacate this portion of the decree. Additionally, in order that our modification has meaning, we also order that Gary reimburse Susan for any cost she paid for health insurance for him since *623 the decree, if she did in fact make such payments.

Did Trial Court Err in Requiring Susan to Pay $3,000 Toward Gary's Attorney Fees?
Susan argues that the district court erred in ordering her to pay $3,000 toward Gary's attorney fees.
The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case.
Gress v. Gress, 271 Neb. 122, 132, 710 N.W.2d 318, 328 (2006). Gary submitted a detailed accounting of his attorney fees, which we have reviewed. After a thorough review of the record, and considering the significant difference in the parties' earning capacities, we find that the district court did not abuse its discretion in ordering Susan to pay $3,000 toward Gary's attorney fees.

Did Trial Court's Order for Parenting Plan Constitute Abuse of Discretion?
Sarah was born in March 1991. Thus, she is now 19 years of age and any issues regarding the parenting plan are now moot and will not be addressed by this court. See State v. McCormick, 246 Neb. 890, 523 N.W.2d 697 (1994) (it is not within province of Supreme Court to determine moot questions).

CONCLUSION
For the reasons stated above, we modify the district court's decree as set forth above and which we summarize as follows: All right, title, and interest in Icon Mountain is awarded to Gary. Gary shall be awarded 33 percent of Susan's 401K account as of May 22, 2009, plus 33 percent of gains or losses since such date pursuant to the more specific directions regarding the necessary QDRO found above in our opinion. We reverse and vacate the portion of the decree ordering Susan to pay for Gary's health insurance during the interlocutory period and order Gary to reimburse Susan for any health insurance she may have paid on his behalf since the decree was entered. We affirm the remainder of the decree.
AFFIRMED IN PART, AFFIRMED IN PART AS MODIFIED, AND IN PART REVERSED AND VACATED.