IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

HOLLERTZ V. ROBINSON

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

SUSAN HOLLERTZ, APPELLEE,

V.

JAMES ROBINSON, APPELLANT.

Filed April 1, 2025.    No. A-24-462.

Appeal from the District Court for Franklin County: TERRI S. HARDER, Judge. Affirmed.

Heather Swanson-Murray, of Swanson Murray Law, L.L.C., for appellant.

Vanessa J. Gorden and Morgan R. Sanchez, of GordenLaw L.L.C., for appellee.

MOORE, PIRTLE, and WELCH, Judges.

MOORE, Judge.

## INTRODUCTION

James Robinson appeals from the order of the district court for Franklin County, which dissolved his marriage to Susan Hollertz. On appeal, James challenges the length and duration of the court's alimony award to Susan. Finding no abuse of discretion, we affirm.

## STATEMENT OF FACTS

James and Susan were married in 1999. No children were born to the marriage.

On August 12, 2021, Susan filed a complaint in the district court, seeking dissolution of the parties' marriage. Additionally, she sought an equitable division of the marital estate, permanent spousal support, and attorney fees. Susan thereafter filed a motion for temporary orders, including a nonhypothecation order restraining the parties from certain actions with respect to their property, an order enjoining and restraining James from molesting or disturbing her peace, and a motion excluding James from certain properties.

- 1 -

Following a hearing, the district court entered a temporary order on November 3, 2021. The court ordered that "the pre-divorce status quo be restored" with respect to a particular bank account of the parties. The court stated further:

> [James] shall deposit his paycheck, grain checks and government payments to this account. [Susan] will continue to pay [James'] living expenses charged on the credit card and the expenses of the farming operation. [Susan] shall also continue to keep the books. Each of the parties' ordinary living expenses may be paid out of this account. Any extraordinary expense would require the agreement of both parties. The Court is aware that [James] has attempted to separate his paycheck, farm proceeds and expenses. Any monies removed from [the account at issue], shall be restored to that account forthwith.

> [Susan] contends [James] has removed $626,367.48 of marital assets from a jointly held account. [James] maintains that these funds are the proceeds of his inheritance. The Court will allow [James] to maintain control of those proceeds during the pendency of this action, however, the issue of whether the money is marital or inheritance is reserved for final hearing. [James] shall not dissipate these funds. Any expenditures must be jointly approved.

The court also excluded James from the properties referenced in Susan's motion during the pendency of the case, restrained the parties from taking certain actions with respect to their real and personal property except in the usual course of business or for the necessaries of life, and ordered the parties to not disturb one another's peace and quiet.

The parties entered into a property settlement ahead of trial, and trial was held before the district court on February 6, 2024, on the issue of alimony only. The parties agreed to resolve the issue of alimony by affidavit. The court received the parties' affidavits concerning alimony and various attached documentation. The court also received a copy of the property settlement agreement.

Under the settlement agreement, Susan was awarded three parcels of real property, identified as "South Ranch," "Behind the Bus Barn," and "Schoolhouse." James was given a right of first refusal in the event Susan wanted to sell, transfer, or otherwise dispose of South Ranch, and Susan was to receive the "Conservation Reserve Program" (CRP) payments for the South Ranch. James was awarded 10 parcels of real property. The agreement does not show the values of the real property awarded to the parties. Susan received personal property totaling $12,060, automobiles and vehicles totaling $76,577, and farm equipment and livestock totaling $33,923.45. In addition to the valued personal property identified in the agreement, Susan was awarded the "Saddlecreek Ranch business name." No value was placed on this award. Susan was awarded an Edward Jones account valued at $151,179.41. She agreed to take the $6,500 loan on a pickup awarded to her and the $8,723.45 loan on a bale mover and lawn mower awarded to her. James received personal property totaling $4,750, automobiles and vehicles totaling $30,183, and farm equipment and livestock totaling $37,050. In addition to the valued items of personal property, James was awarded the contents of the garage and "[a]ll fence posts, wire, staples, etc." on one the real properties he was awarded, as well as the 2023 corn crop in storage (27,240.99 bushels), the 2023 soybean crop in storage (1,305.85 bushels), and certain seed corn, herbicide, and fertilizer previously purchased. These items were not valued. James was awarded bank accounts valued at

$6.78 and $50,574.53, a CD valued at $500,917, and a "Super Now" account valued at $133,112.96. He was given the $83,016.51 loan "for new pivot" incurred prior to filing of the dissolution complaint. The agreement also specified the division of certain nonmarital personal property. The parties agreed that James was to pay Susan an equalization payment of $200,000 and $13,000 toward Susan's attorney's fees.

Susan was 68 years old and in good health at the time of her affidavit dated January 31, 2024. She was living on the South Ranch property. She was receiving $801.70 per month ($627 after deductions for insurance) in monthly Social Security benefits. She stated that this amount would increase to $1,300 (less insurance) per month 2 years after the divorce was final. Susan noted that she filed for Social Security "at full retirement age" but only received "the minimum amount" because she had not had taxable income since 2011. Susan indicated that she had been told she could draw on James' Social Security 2 years after the divorce was final. According to Susan, James was awarded all of the parties' income-producing land as part of the division of marital property and that Social Security and alimony would be her only sources of income. She stated that her Social Security income was not nearly enough to cover her day-to-day reasonable and necessary living expenses.

Susan attached spreadsheets showing "a detailed breakdown" of her monthly living expenses. Susan detailed farm expenses of $2,070.86, medical expenses of $290.54, living expenses of $1,346.14, miscellaneous expenses of $181.21, and vintage schoolhouse expenses of $587.58, for a monthly total of $4,476.33. She provided a further detailed breakdown of the components of each of these monthly expenses, which we do not set forth here, although we note that the schoolhouse expense was comprised of bills for heating, cooling, hot water, landline and internet (wireless used for surveillance cameras), property taxes, and a soft water and reverse osmosis system. Susan also attached "a hand accounting" of her and James' income and expenses for 2023. Susan did not provide further testimony in her affidavit as to the method by which she compiled the information in this 12-page attachment, and the poor quality of the photocopy makes it difficult to discern everything detailed therein.

Susan testified in her affidavit that she gave up her career to serve James in his farm/ranching operation. Prior to the marriage, she ran her own interior design business. She detailed her extensive interior design work experience which began when she started learning interior design in California in 1982, followed by working in California, opening a studio in Oxford, Nebraska, and then moving to Lyons, Colorado, and opening a studio. To pursue her dream of owning her own land, Susan moved back to Nebraska in 1993 and opened a studio in her home. Her remodeling work since that time included work for various business and residential clients. Susan stated that in June 1997, she purchased and then remodeled the Huntley School House (built in 1942). Her business and her remodel of this vintage schoolhouse have been written about in newspapers throughout the country. According to Susan, her income varied during the years she ran her interior design business. She estimated that she was earning between $30,000 and $40,000 per year. Her largest job was for approximately $60,000 for the total remodel of a nursing home. Her last job completed in June 2011, was for around $24,000. Susan stated that she put most of the money from her last interior design job "into the South Ranch." She stated that she quit running her interior design business at James' request and indicated that he told her she "would be too busy being a homemaker and helping him run the farm/ranch."

Susan testified that in early 2011, James wanted to move to Bloomington, Nebraska, as his parents were "getting older and more fragile." Susan closed her interior design business and began driving to Bloomington daily to start her "next big project" of designing and building the parties' home at the South Ranch and the "arduous task" of cleaning up the property. According to Susan, when the parties took possession of the South Ranch property, it was "mostly weeds with junk everywhere," had an old, abandoned house, a rundown, dilapidated barn, and old buildings with roofs falling in. She detailed her active involvement in the work in renovating the property and noted that she paid for certain items and portions of the work using her interior design money. Susan stated that during "the first years after [she] started building [the parties] a home" on the South Ranch property, she turned down "several big jobs" because James told her, "You don't have time to work outside the home. There's too much to take care of."

According to Susan, because James was "always working outside the home," and "worked long hours as a farm hand for the neighbor," she was "tasked with taking care of the day-to-day work that needed done for the farm/ranch." Susan stated that she took care of tasks including gardening, taking care of the livestock, running farm/ranch related errands, tending fences and nuisance weeds, planting grass in the "huge barnyard area," and many other tasks. She made medical appointments for James' parents, took them to their appointments, ran errands for them, and "took care of all [their] needs." Susan also remodeled James' mother's house in 2005.

Susan raised Morgan horses before meeting James, and she stated that her goal was "to breed Old Foundation Western Working Morgan horses of color." Susan became interested in Scottish Highland cattle after becoming aware of "their exceptional longevity and hardiness." She testified at length about the Morgan horses and Scottish Highland cattle she acquired during the marriage, her efforts toward a successful breeding program for both her cattle and her horses, and she described the loss of her purchased "imported [cattle] semen" through the actions of James' adult son. According to Susan, James "did not support [her] on her livestock." Susan stated that she had purchased the livestock with the hope of it "turning into a profitable venture" and that she hoped to continue her livestock breeding program. She stated, "But for [James'] actions/inaction, my livestock would have been profitable, and it certainly can be."

Susan expressed uncertainty about being able to reenter the workforce after the divorce, noting that she would soon be 69 years old, had arthritis in her knees, could no longer climb ladders, and could no longer do the "hard physical labor" required for interior design work. She did note, however, that she has "a strong core," which she attributed to working "very hard" and "pitch[ing] hay mostly by hand."

Susan stated that in addition to being a homemaker and errand runner during the marriage, she also "was tasked with paying all bills and running the business side" of the ranch and farming operation. She did "hand accountings" each year of the parties' farm and ranch income and expenditures and attached 5 years of her hand accountings (51 pages) to her affidavit. According to Susan, the parties' income tax returns are not "a true representation" of James' ability to pay alimony. She stated that her hand accountings show that the farm/ranch business "generates a lot of income." She stated that all of James' food, gas, and living expenses, are "paid for pretax because they are business expenses." She also stated that they would meet with their accountant at the end of each year "to figure out how much [they] wanted to prepay in expenses and what capital improvements [they] could make to lower [their] taxable income to around $30,000."

Susan attached a copy of a letter from James' attorney to her affidavit. According to Susan, James had been paying her $1,800 a month "for alimony," and she asserted that the letter shows that James and his attorney determined how much she should receive. Susan stated that she never agreed to that amount and that it was not enough to cover her expenses. She noted that she had her attorney file a contempt proceeding "to restore [her] ability to pay all [her] living expenses out of the joint account" but that the contempt issue was settled prior to trial "as part of the comprehensive settlement on property."

The letter referred to by Susan is an email from James' attorney to Susan's attorney dated November 15, 2022, that was forwarded to Susan by her attorney on November 16. In the email, James' attorney stated:

Due to the ongoing concerns about how the farm income is being handled – or mishandled, [James] had no choice but to provide money to cover the overdrafts or outstanding checks in the farm bank account. He will then close out the account. I believe he has done so after visiting with the banker. He will then take care of farm expenses himself.

He will provide [Susan] with every other one of his paychecks for [her] personal expenses. He will place every other check in the west drop box.

He will be accountable for every bit of income and every farm and personal expense he pays.

Please advise if you plan to do the taxes. If so, he will provide information you need.

I had hoped we could resolve these issues with a hearing before the Judge but that is not possible any time soon. [James'] main concern is to preserve the farming operation and to do so he must take these steps.

The attachments to Susan's affidavit include checks of $1,831.30 from James to Susan dated October 10 and 24, and December 15, 2022; January 3 and 16, February 12, March 8, April 15, May 24, June 20, July 25, August 20, September 28, October 21, November 27, and December 21, 2023.

Susan inherited $155,266.17 from her father's estate on May 24, 2022. A copy of the inheritance check is attached to her affidavit. According to Susan, she had to use $56,071.78 from the inheritance "to live and maintain the South Ranch since [James] violated the Court's order and cut [her] off from the Joint Farm Account" in November 2022. She attached documentation of the transfers from the account into which the inheritance was deposited into her checking account (deposit slips and spreadsheet showing $39,400 in transfers between November 2022 and December 2023) and documentation of the bills she paid directly from the inheritance account (copies of invoices, anticipated invoice amounts, and checks totaling $16,671.78). Susan stated that the only liquid assets she has to supplement her Social Security income and an award of permanent alimony are the remaining $100,000 of her inheritance, the $200,000 equalization payment, and her $151,179.41 Edward Jones account.

James submitted two affidavits. James was 65 years old at the time of his first affidavit dated January 29, 2024. He stated that his income comes from "[his] job with [two other individuals]" and from his farming operation. Although James does not elaborate on the nature of

this job in his affidavits, the parties represent in their briefs that he was employed as a farm hand. He attached a summary of his income from 2018-2022. James' summary reflects a total of his W-2 wages, interest income, depreciation, and farm income/loss for each year ($37,306 in 2018, $38,422 in 2019, $51,594 in 2020, $40,364 in 2021, and $82,710 in 2022). Based on the average of these amounts, James calculated that his monthly income over the 5-year period was $4,173.25. The parties' joint tax returns were received into evidence, and they reflect federal adjusted gross income for the parties of $50,135 for 2018, $43,603 for 2019, $43,311 for 2020, $36,631 for 2021, and $39,984 for 2022. The returns reflect the same amounts of W-2 income, taxable interest, depreciation, and farm income/loss (losses for all 5 years) as included in James' summary, except for $38 interest income that he omitted from the summary. According to James, his 2024 income and future income will be comparable to the previous 5 years. He stated that his farming operation "will remain similar depending on the prices of corn and beans" and that he planned to retire "from [his] job" in 2 years.

James attached an estimate of his personal living expenses based on "looking through [his] records" for the past year. James estimated monthly expenses totaling $1,695, comprised of his expenses for personal auto insurance, taxes, and license; gas, fuel, and oil for home and personal vehicle; life insurance premium; telephone/cable; utilities; groceries; and health insurance.

James noted that Susan was not employed during the marriage, but he stated that she "did conduct a small business." According to James, Susan is physically and mentally capable of working at least a minimum wage job. James stated that Susan would be able to draw approximately $588 more in Social Security than she was currently, based on his earnings, and he attached copies of his Social Security statement and a publication explaining spousal benefits. James noted the equalization payment awarded to Susan in the property settlement agreement, asserting that if "invested properly," it could yield additional income for her. James also noted the inheritance Susan received from her father. James noted other sources, or potential sources, of income for Susan: income from 11 acres enrolled in the CRP, possible pasture rent for 50 acres of "pasture and hay ground," her Edward Jones account, and possible rent from one of the two homes she was awarded. According to James, Susan "has over $507,000 in liquid assets which could yield income." James stated that Susan's horses and cattle were "more like pets" and were "not income producing."

James addressed his having taken over the books for the farming operation during the pendency of the divorce. He stated that he did this because "she wrote insufficient fund checks and there were credit card, [P]ay [Pa]l and [A]mazon purchases that exceed what [he] would consider ordinary living expenses," stating further that Susan did not discuss "any extraordinary expenses" with him as required by the district court's temporary order. Susan's version of events leading to the overdrafts was not reflected directly in her affidavit, but we note a more detailed notation in one of her attachments in which she describes a sequence of the parties closing and opening various bank accounts and miscommunications between the parties and the bank around the time of the temporary order.

James characterized his second affidavit dated February 5, 2024, as his "rebuttal" to Susan's affidavit. He stated that he worked for Central Valley Irrigation from 2004 to 2014, sometimes up to 16 hours per day. He left Central Valley in 2015 and went to work for another individual. James characterized Susan's assertions about helping him farm as "greatly

- 6 -

exaggerated." James stated that he did not "really get into farming" until his father gave him the property referred to as "the pivot" in 2014. After his father died in 2016, James helped his mother manage the farm but did not "physically farm it." James took over the farming after his mother died 2021. James stated that he did not have time to help Susan "with her projects," but he adamantly denied stopping her from pursuing any career. James also denied ever expecting Susan to give up her career or expecting her to start another one.

James disputed Susan's assertion of her having purchased the Huntley School. James stated that he purchased the school in 1997, prior to the parties' marriage, and he attached a copy of a $2,855.50 check from "J & S Farms" (signed by him) to "Wolfe Realty" for "Huntly School & Field." With respect to Susan's statements about the parties' tax returns, James stated, "[A]ll I can say is that she helped gather the information for the accountant and she signed the returns."

James stated that he took over the farm account in November 2022 for the reasons specified in his previous affidavit. He noted that the parties had filed contempt proceedings but dismissed them upon resolving "those issues." As soon as he took over the farm account, he began giving Susan every other paycheck from his job in the amount of "approximately $1,831." James noted that the parties received a tax credit, which went into the farm account, and that he wrote Susan a check for $3,256.50 for her half. He also made sure Susan received a $1,200 check, which was "the insurance for a bale fire."

James disputed the reasonableness of Susan's living expenses. He noted that she had 80 acres, two cows, a steer, and three horses. He stated that Susan had never created any income from her animals, described Susan's activity as "hobby farming," and asserted that he should not have to "support it." With respect to the expenses Susan had listed for the schoolhouse, James noted that no one lived on the property, and he asserted that the only necessary expenses for the schoolhouse were for the real estate taxes and "enough heat to keep the pipes from freezing OR she can drain the pipes."

The district court entered a decree dissolving the parties' marriage on March 26, 2024. The court approved the parties' property settlement and ordered the parties to perform and abide by its terms. The court ordered James to pay Susan alimony of $2,000 per month for 150 months, commencing February 1, 2024. The court stated that Susan "should have the ability to supplement her income by employment" and "should also be able to invest the cash she has on hand to generate additional monthly income." Finally, the court ordered James to pay Susan "a money judgment" of $200,000 and to pay $13,000 toward her attorney fees.

James filed a motion for new trial, challenging the amount and duration of the district court's award of alimony to Susan, asserting that it would require him "to work many years past his expected retirement date." On May 22, 2024, the court entered an order modifying the duration of the alimony award to 120 months. James subsequently perfected his appeal to this court.

ASSIGNMENT OF ERROR

James asserts that the district court abused its discretion in awarding Susan alimony of $2,000 per month for a total of 120 months.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in his or her determinations regarding custody, child support, division of property, alimony, and attorney fees. *Stava v. Stava*, 318 Neb. 32, 13 N.W.3d 184 (2024).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id.* When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024).

ANALYSIS

James asserts that the district court abused its discretion in awarding Susan alimony of $2,000 per month for a total of 120 months. James argues the alimony award in this case is an attempt by the court to equalize the parties' incomes and to punish him.

Neb. Rev. Stat. § 42-365 (Reissue 2016) provides:

> When dissolution of a marriage is decreed, the court may order payment of such alimony by one party to the other and division of property as may be reasonable, having regard for the circumstances of the parties, duration of the marriage, a history of the contributions to the marriage by each party, including contributions to the care and education of the children, and interruption of personal careers or educational opportunities, and the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of such party.

In addition to the specific criteria listed in § 42-365, in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

The reasonable duration of an alimony award depends on the specific facts in a given case, often the amount of time required to allow the recipient spouse to support himself or herself. *Seemann v. Seemann, supra.* Alimony should not be used to equalize the incomes of the parties or to punish one of the parties. *Id.* Rather, the primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Id.*

In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result with the ultimate criterion being reasonableness. *Id.* An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

We first address James' assertion that he has been "paying alimony" to Susan since November 2021, apparently in reference to the financial arrangements set forth in the district

court's November 2021 temporary order and the alteration to those arrangements set forth in his attorney's November 2022 email to Susan's attorney. James also asserts that the parties were married for 22 years and 2 months (calculating from their marriage in June 1999 to the filing of the complaint in August 2021). He then argues that the term of permanent alimony ordered by the court, when added to the "temporary alimony" he has already paid, "exceeds half . . . the length of the marriage by more than a year and constitutes 55% of the length of the marriage of the parties. Brief for appellant at 12.

Regardless of how the parties characterized the checks deposited into certain accounts following the district court's November 2021 temporary order and during the pendency of the divorce proceedings, Susan did not seek an award of temporary alimony in either her complaint or her temporary motions and the temporary order did not include an award of temporary alimony. We also disagree with James' assertion that the parties' marriage ended with the filing of Susan's complaint for dissolution in August 2021, rather than with the decree entered by the court in March 2024. See Neb. Rev. Stat. § 42-347(3) (Reissue 2016) (dissolution of marriage means termination of marriage by decree of court of competent jurisdiction upon finding that marriage is irretrievably broken). As to James' calculation, there is no mathematical formula by which alimony awards can be precisely determined. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020). This was clearly a marriage of long duration, a factor we will consider in our review of the award of permanent alimony.

In challenging the duration of the alimony award, James takes issue primarily with the award extending past his anticipated retirement date. At the time of their January 2024, affidavits, James and Susan were 65 and 68 years old, respectively. James was involved in his own farming operation and also had other outside employment as a farm hand. James stated that he planned to retire from his "job" in 2 years. On appeal, James argues that the "practical effect" of the alimony award is that he will have to continue working until he is 75 years old to service and meet his obligation. Brief for appellant at 13. James acknowledges, however, that no Nebraska cases have specifically held that an award of alimony past the age of retirement is inappropriate.

James notes *Radmanesh v. Radmanesh, supra*, wherein the Nebraska Supreme Court found that the husband's age of 65 years at time of trial did not make an alimony award of 5 years' duration unreasonable. The Supreme Court noted that it had never suggested that there is an age at which a party to a divorce is too old to pay alimony. The Court also noted that the terms of an award depend on what is reasonable under the circumstances of each case and that the duration of the award must be reasonable. In that case the husband had testified that he would like to work until he was 70 or older and that he intended to work for at least the next 5 years if he was able to do so. Under those circumstances, the Court found the 5-year alimony term was reasonable.

James argues that since his plan to retire in 2 years was known at the time the district court entered the decree, his retirement, when it occurs, cannot be the basis for a future modification of his alimony obligation. He argues that this makes the alimony award "essentially non-modifiable," places him in the position of having to work for 10 years past "traditional retirement age," and gives Susan no incentive to work and support herself. Brief for appellant at 16.

Section 42-365 provides that alimony orders may be modified or revoked for good cause shown. Good cause means a material and substantial change in circumstances and depends upon the circumstances of each case. *Mackiewicz v. Mackiewicz*, 313 Neb. 281, 984 N.W.2d 253 (2023).

Good cause is demonstrated by a material change in circumstances, but any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. *Id.*

James argues that this case is similar to *Titus v. Titus*, 19 Neb. App. 751, 811 N.W.2d 318 (2012), that he has "the same concerns and predicament" as the alimony obligor in that case, and that without a finding like this court made in that case, his alimony obligation is "non-modifiable." Brief for appellant at 17. In *Titus*, the alimony obligor expressed a similar concern about his ability to seek a future modification, given his trial testimony that he expected his income to decline following the end of a 5-year employment contract based on developments in the industry in which he worked. The obligor admitted, however, that future changes in the industry were speculative and that his actual future income was unknown. He anticipated reaching a new employment agreement at the end of the current contract and testified that he would like to work until around age 60. In addressing his concern on appeal about a future modification, this court found that its decision to affirm the alimony award was based upon the obligor's earnings prior to trial rather than upon his speculative testimony about future changes to his income. We specifically found that in the event of a future motion to modify alimony based on a reduction in his income, such a change would not be deemed a change that was in the contemplation of, or anticipated by, the parties. See, also, *Thompson v. Thompson*, 18 Neb. App. 363, 782 N.W.2d 607 (2010).

In this case, the district court's alimony award extends 120 months or until the death of either party or Susan's remarriage. If the award remains in effect for the entire 120 months, James will be 75 years old, and Susan will be 79 (or approaching that age). James' argument that he will have to postpone his retirement in order to meet his alimony obligation is speculative at this time. James expressed his intent to retire from his "job" in 2 years. However, James did not indicate in his affidavits that he intended to cease his own farming operation in 2 years. Additionally, his argument ignores any income that might otherwise be produced by the assets he was awarded, regardless of whether he continues his own farming operation. The attachments to James' affidavits included a copy of his Social Security statement from November 2023, which shows that at his full retirement age of "66 and 10 months," his retirement benefit would be $2,720. Thus, the district court had evidence that James would have income following any future decision to "retire" from his farm hand job. James did not present any evidence to suggest that his health, or any other factors, would prevent him from engaging in his farming operation in the future. Nebraska case law shows that, rather than modify the duration of the alimony award now, based upon speculative future events, the better course of action is to leave it in place until further order of the district court. See, *Gale v. Gale*, 224 Neb. 803, 401 N.W.2d 501 (1987); *Titus v. Titus, supra*.

Under the circumstances of this case as presented at the time of trial, we find that the duration of the alimony award is not unreasonable. See *Radmanesh v. Radmanesh*, 315 Neb. 393, 996 N.W.2d 592 (2023).

With respect to the amount of award, James argues that Susan's experience and skills in the interior design business, her ability to engage in manual labor on the parties' farm, and her excellent health should not present a conclusion that she is unemployable or incapable of working full-time. He argues that income from Susan's liquid or cash assets and her Social Security together with employment from even a minimum wage job should be more than enough to cover her stated

monthly expenses. James argues that if Susan does not believe her livestock breeding program can be profitable, she should no longer need to keep spending $2,070.86 per month for farm expenses and that she can generate additional income by renting the Huntley schoolhouse property and the farm ground she was awarded. James notes that alimony should not be used to equalize income and does not guarantee the same standard of living a spouse enjoyed during the marriage. See *Seemann v. Seemann*, 316 Neb. 671, 6 N.W.3d 502 (2024); *Taylor v. Taylor*, 222 Neb. 721, 386 N.W.2d 851 (1986).

James argues that once he retires from his job as a farm hand, and begins drawing Social Security at age 67, he will only receive $2,720 per month and will no longer have his W-2 earnings. He argues that at that point, his alimony obligation will constitute "72% of his regular income." James notes that the Nebraska Supreme Court has previously stated that child support obligors "should not ordinarily have to mortgage their homes or live in their cars in order to pay child support that is above the [Nebraska Child Support] guidelines," and he argues that the same principle should apply in the payment of alimony. *Stekr v. Beecham*, 291 Neb. 883, 890, 869 N.W.2d 347, 353 (2015). However, the Nebraska Child Support Guidelines do not apply if the parties have no minor children. See *Binder v. Binder*, 291 Neb. 255, 864 N.W.2d 689 (2015). And, James' arguments ignore the income from his farming operation and any income that might otherwise be produced by the assets he was awarded.

This was a marriage of long duration, and although the parties did not have any children, Susan clearly interrupted her interior design career in 2011, after which she contributed significantly to the restoration of the property where the parties lived and she cared for James' parents. James does not dispute these contributions to the parties' marriage, but he argues that Susan's assertions in her affidavit about helping him farm were exaggerated. We read Susan's affidavit as stating that she performed certain work on the property where the parties lived and for James' parents, rather than stating that she was actively engaged in James' parents' or James' own farming operation. Susan is in good health, but she asserts that she can no longer do the active and heavy work of interior decorating. While she hopes to earn money from her cattle and horses, that has not been a profitable venture so far and any income from her livestock breeding program is speculative at this point. And, while Susan was awarded certain real property, aside from the indication that a certain portion of the property is enrolled as CRP land, there is no information in the record as to whether other portions of that property are rentable. While Susan undoubtedly learned many valuable skills through the unpaid work she performed during the marriage, Susan last earned taxable income in 2011. We also note that, contrary to James' assertion that he will only have his Social Security income after retirement, he will still have farm income and/or income that might otherwise be produced by the assets he was awarded. The amount of alimony awarded to Susan is not unreasonable.

In our de novo review of the record, we find no abuse of discretion by the district court in either the duration or the amount of alimony awarded to Susan.

CONCLUSION

The district court did not abuse its discretion in the award of alimony to Susan. Accordingly, we affirm the decree of dissolution entered by the court.

AFFIRMED.

- 11 -