IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

BEECHAM V. BEECHAM

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KELLY K. BEECHAM, APPELLANT AND CROSS-APPELLEE,

V.

PATRICK K. BEECHAM, APPELLEE AND CROSS-APPELLANT.

Filed November 29, 2022.    No. A-21-1043.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge.
Affirmed as modified.

Brent M. Kuhn and Haley L. Cannon, of Brent Kuhn Law, for appellant.

Adam E. Astley, of Astley Putnam, P.C., L.L.O., for appellee.

PIRTLE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

The Douglas County District Court dissolved the marriage of Kelly K. Beecham and
Patrick K. Beecham, addressed custody and child support, awarded spousal support to Kelly, and
divided the parties' property and debts. On appeal, Kelly challenges the district court's valuation
and division of the marital estate, and the allocation of their child's private school tuition. On
cross-appeal, Patrick claims the district court counted the downpayment on his new home twice in
its division of the marital estate. We affirm as modified.

## II. BACKGROUND

Kelly and Patrick were married in 2002. Together they have one daughter, Kennedy
Beecham, born in 2003. Additionally, Kelly and Patrick each have an older daughter from their
previous relationships. During the parties' marriage, Kelly received child support for her older

- 1 -

daughter, Delaney S., born in 2000, from Delaney's father. And Patrick paid child support for his older daughter who was born in 1989.

On November 10, 2017, Kelly filed a complaint for dissolution of marriage and sought joint legal and sole physical custody of Kennedy, child support, spousal support, an equitable division of the parties' property and debts, and attorney fees. In his answer and counterclaim filed on May 11, 2018, Patrick sought joint legal and physical custody of Kennedy, a determination of child support, and an equitable division of the parties' property and debts.

Despite the divorce filing, Kelly and Patrick continued to reside together in the marital home until October 2018, at which time they physically separated. Kelly remained in the marital home, and Patrick moved to a different home.

In its temporary order entered on April 26, 2019, the district court awarded the parties joint legal and physical custody of Kennedy and established a parenting time schedule. The court ordered that beginning on January 1, 2019, Patrick was to pay Kelly $718 per month in child support and $1,500 per month in spousal support. Additionally, beginning January 1, and until further order of the court, Patrick was to pay 75 percent of Kennedy's private high school tuition and fees, and Kelly was to pay 25 percent of the tuition and fees.

Trial was held via Zoom on February 11, 2021. Patrick, 59 years old, and Kelly, 54 years old, both testified. Additionally, numerous exhibits were received into evidence; the parties had stipulated to having most of the exhibits received without foundational objections and those exhibits were received at the beginning of trial. The testimony and exhibits will be discussed as necessary in our analysis.

The district court entered a decree of dissolution on May 28, 2021. The court awarded the parties joint legal and physical custody of Kennedy, 17 years old at the time of trial, and the parties received equal parenting time. The court ordered Patrick to pay Kelly $672 per month in child support and $3,000 per month for 60 months in spousal support. Additionally, each party was to pay one-half of the ongoing tuition and other expenses necessary for Kennedy to attend her private high school until her graduation. The court divided the parties' property and debts, and then ordered Patrick to pay Kelly $60,000 from a specified IRA to equalize the property award. The court's decree did not include a balance sheet or overall valuation of the parties' marital estate; it also did not include specific values for the parties' assets, but it did include approximate values for most of the debts.

On June 3, 2021, Kelly filed a motion to alter or amend the decree. In support of her motion, Kelly alleged that the decree contained errors and was not supported by the evidence, did not account for all of the marital assets and debts, left matters vague and subject to dispute, failed to address certain nonmarital assets claimed by Kelly, was not equitable, and failed to account for the parties' marital contributions during the temporary period.

A hearing on Kelly's motion to alter or amend was held on June 17, 2021. In its order filed on September 17, the district court denied Kelly's motion in part, but did agree half of a $33,522 loan taken out of marital funds to pay for a downpayment on Patrick's new home should be added to the $60,000 equalization payment. Accordingly, the court ordered the decree be amended to reflect that Patrick was to pay Kelly $76,761 from the specified IRA to equalize the property award.

On September 21, 2021, Patrick filed a motion for the district court to alter or amend its September 17 order. He alleged that the court already considered the $33,522 loan taken out of marital funds in the original decree, and thus no further award to Kelly was necessary to equalize the marital property. On September 28, Kelly filed a motion for reconsideration of the court's September 17 order, reiterating errors she raised at the hearing on her previous motion to alter or amend but denied by the court. In its order entered on December 15, 2021, the court denied Patrick's motion to alter or amend and Kelly's motion for reconsideration.

Kelly appeals and Patrick cross-appeals.

## III. ASSIGNMENTS OF ERROR

Kelly assigns, reordered, that the district court abused its discretion (1) when it included in the marital estate child support payments collected by Kelly during the marriage for her older daughter while at the same time not considering child support paid by Patrick for his older daughter, (2) in its determination of the fair market value of the marital home awarded to Kelly, (3) by including within the marital estate certain premarital assets owned by Kelly, (4) in not allowing Kelly to offer evidence posttrial concerning the fair market of her automobile, (5) by not including in the marital estate Patrick's employer-provided bonus paid during the temporary period from separation to trial and by failing to include the rental income collected by Patrick for the same period, (6) when it ordered Kelly to pay private school tuition for the parties' minor child at the same rate as Patrick despite the substantial disparity in the respective incomes and failing to take into account money utilized by Patrick from a NEST account, and (7) in the overall accounting and allocation of the marital assets and debts resulting in material error with respect to the equalization amount to Kelly from Patrick.

On cross-appeal, Patrick assigns that the district court counted the downpayment on his new home twice.

## IV. STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. GENERAL LEGAL PRINCIPLES

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck v. Jeanette, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). When evidence is in

conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

As noted previously, the district court's decree did not include a balance sheet or overall valuation of the parties' marital estate; it also did not include specific values for the parties' assets, but it did include approximate values for most of the debts. The lack of a balance sheet or specified values for the assets and debts make it difficult to review the parties' assigned errors. We will address the assigned errors as best as possible based on the record before us.

## 2. KELLY'S APPEAL

### (a) Inclusion of Child Support in Marital Estate

Kelly contends the district court abused its discretion when it included in the marital estate the child support payments Kelly received during the marriage from the biological father of a child not of the marriage, but did not include child support Patrick paid for a child not of the marriage. She suggests the court "should have treated both incoming and outgoing support in the same consistent manner in making a fair and equitable division of the marital estate." Brief for appellant at 11.

During the parties' marriage, Patrick and Kelly both deposited their employment earnings into a joint account at US Bank, and that account was used to pay their bills and expenses.

Patrick has an older daughter from a previous relationship. His daughter, born in 1989, was 13 years old at the time of his marriage to Kelly in 2002. During his marriage to Kelly, Patrick paid $600 or $700 per month in child support for his older daughter until she turned 19 years old. His daughter was 31 years old at the time of trial.

Kelly also has an older daughter from a previous relationship. Her older daughter, Delaney, born in 2000, was 2 years old when Patrick and Kelly married in 2002. Patrick and Kelly had an account at US Bank where they deposited Delaney's child support money from her father. No other monies were deposited into that account. When asked if Kelly used the child support account money to pay for Delaney's private school tuition, activity expenses, or other things, Patrick replied, "Not to my knowledge." According to Patrick, there were times during the marriage that he "would borrow money" from Delaney's child support account to pay bills if there was a shortfall in the parties' joint account, and the "borrowed" money was never repaid to the child support account; he said it did not happen very often and he did not remember the amount of money that was taken out of Delaney's account to pay the parties' expenses.

In the divorce, Patrick "want[s] half" of the money in Delaney's child support account "[b]ecause none of that money was used to pay for any [private school] tuition," "[a] lot of the expenses that Delaney incurred we just paid for out of our joint account," including Delaney's tuition. On cross-examination, Patrick was asked if it was his position that the money should be considered marital property because he provided support for Delaney throughout the marriage; he responded, "Yes." According to Patrick, Kelly was not employed for about 4 years when Kennedy was born. And Delaney's father did not pay child support on a regular and consistent basis.

Exhibit 12 is the child support payment history report for Delaney's child support from December 2001 through February 2021. The payment history report reveals that most of the time, Delaney's father was behind on his child support payments. In fact, from November 2011 through

June 2019, the child support arrearage plus interest was never less than $10,000 and there were times when the arrearage was more than $20,000 or even $50,000. It was not until July 2019 that Delaney's father paid a lump sum of more than $16,000 to bring the child support balance down to $0.

Patrick's position was that child support monies received for Delaney after the parties' October 2018 separation were also marital property because the money would have been for child support that accrued during the time the parties were living together and providing support for Delaney.

Kelly does not agree that Patrick should receive half of the funds in Delaney's child support account. Kelly stated, "[T]he funds were for my daughter's benefit from her father through child support." She continued, "I used a significant amount of money from child support, along with my own earnings, to pay for Delaney's education, for her soccer, for her activities." Kelly stated,

> In addition to that, at one point, Pat had removed $10,000 from one of her accounts without my knowledge or consent. Prior to that, he had full access to these accounts. It was connected to our joint account. . . . He had access . . . to any funds that came in for child support. It was a joint account as a married couple. And then he typically would be the one who would allocate a portion of that money, of that child support that came in, to a savings account, because it could easily transfer because they're all tied together. Typically, it would be maybe half the child support that came in. Then he would leave the rest in our joint account for Delaney's expenses.

> So between that and then my income, it more than covered her expenses, her education, all of these things. . . .

> So he did not cover Delaney's expenses, by any means. I was working. I paid for her expenses, and I supplemented that with child support.

According to Kelly's testimony, she has a First National Bank account with Delaney. In December 2018, Kelly deposited approximately $40,000 of Delaney's child support money into the First National Bank account; this deposit is also reflected in bank statements in exhibit 27. Kelly wanted that money allocated to Delaney and to not be considered a marital asset.

Additionally, Kelly obtained a $10,000 CD at First National Bank; she funded the CD using her earnings after Patrick moved out and some of Delaney's child support money. When asked what she contributed in addition to the money that was from Delaney's child support, Kelly responded, "I'd have to look, but it wasn't a significant amount." Exhibits received into evidence show that $10,000 was deposited into a 17-month CD in April 2019. Kelly later cashed the CD "because it was due" and at the time of trial she was "looking to find something [she] can reinvest it with." Kelly wanted the money from the CD to be allocated to Delaney.

Patrick testified that at some point, he and Kelly took $35,000 to $40,000 out of Delaney's child support account and put it into their Renaissance account "[t]o invest it" because "[i]t was just sitting in a savings account; at the time of the investment, Patrick believed half of the money was his. When asked if he ever had any discussions with anyone at the investment company that the accounts opened for Delaney were to be used for Delaney, Patrick replied, "Yes." Patrick said he told the investment advisor that "it was money that we were taking from [Delaney's] child

support account and we wanted to invest it." When asked if he ever indicated to the investment advisor that the money was Delaney's money, Patrick responded, "No."

According to Kelly, $54,000 from Delaney's child support money was deposited into the Renaissance account in March 2016. Kelly testified that the child support funds moved to the Renaissance account were "very clearly and specifically identified as child support funds that were going in for future support of Delaney, particular [sic] for her education needs"; "I actually asked them to document that in the records, which they did, Renaissance did." It was Kelly's position that funds allocated to Delaney belong to Delaney and should not be divided as a marital asset.

In its decree, the district court did not specify that the First National Bank account, the CD, or the Renaissance funds were to be set aside as belonging to Delaney. Rather, the court awarded those three assets to Kelly, and thus it appears, and the parties do not dispute, that those assets were included in the marital estate.

Based on our review of the record, the district court did not abuse its discretion when it included in the marital estate those accounts and the CD consisting of child support money paid by Delaney's biological father. By Kelly's own testimony, "at least half" of that child support money was set aside into a savings account, and the rest of the money was left in the parties' joint account for Delaney's expenses. Kelly stated,

> So between that [child support] and then my income, it more than covered her expenses, her education, all of these things. . . .
>
> So [Patrick] did not cover Delaney's expenses, by any means. I was working. *I paid for her expenses, and I supplemented that with child support.*

(Emphasis supplied.)

Kelly's testimony demonstrates that at least half of the child support paid for Delaney's benefit was allowed to accumulate while the parties' marital assets paid for Delaney's expenses. Both Kelly and Patrick's income during the marriage was marital income. See *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017) (income earned from one or both spouses' employment during marriage is marital asset). They each had a parental obligation to support their older children, and both paid their respective obligation out of marital funds as they were entitled to do; Patrick actively paid child support for his older daughter, while Kelly's support obligation for Delaney would have been taken into account in the child support calculation and award for Delaney. However, the parties' marital earnings paid a disproportionate amount of Delaney's support and expenses when the child support paid by her father was allowed to accumulate. Therefore, we agree with Patrick that "[i]t would be inequitable to allow Kelly to retain all of the [child support] funds that were saved because the marriage paid for Delaney." Brief for appellee at 10. See *Grillot v. Grillot*, No. A-02-1392, 2004 WL 1317873 (Neb. App. June 15, 2004) (trial court did not abuse its discretion in deeming majority of wife's 23-year-old child's savings account, of which wife was authorized signer, to be marital property; husband supported wife's child since age 6 and majority of money in said account consisted of child support payments for that child.) Based on our review of the record, the district court did not abuse its discretion when it included in the marital estate the First National Bank and Renaissance accounts and the CD consisting of child support money.

### (b) Fair Market Value of Marital Home

Kelly contends that the district court abused its discretion in its determination of the fair market value of the marital home awarded to Kelly based upon Patrick's unsupported testimony.

Kelly's position at trial was that the Douglas County assessor's value should be utilized for the fair market value of the marital home; the assessed value was $254,800. She also testified that deferred maintenance needed to be done, e.g., "[t]he driveway completely needs to be replaced," "[t]he entire backyard, there's literally no . . . grass in the backyard," "landscape is falling down," "[t]he floors." Patrick testified that he "had a couple of real estate agents run some comps" and he would value the marital home at "over $300,000." He was not aware of any deferred maintenance that was needed on the home.

We do not know what the district court determined the fair market value of the marital home to be because it did not specify a value in its decree or otherwise include or incorporate a balance sheet for the division of the marital estate. However, even if the court chose to accept Patrick's valuation of the marital home—as Kelly suggested the court did at the hearing on her motion to alter or amend in her exhibit 111—the court did not abuse its discretion.

To the extent that the district court used the Douglas County assessor's valuations to determine the fair market value of the parties' other real properties, we note the parties' themselves did not dispute the use of those valuations for those properties. However, the parties did dispute the value of the marital home. Kelly relied on the Douglas County assessor's value of $254,800 for the marital home, while Patrick valued the home at $300,000 after having real estate agents "run some comps." Although Kelly testified that deferred maintenance was needed on the home, she did not testify as to the cost of such maintenance, or how the needed maintenance would affect the property's value; Patrick was not aware of any deferred maintenance that was needed on the home.

Patrick, as an owner of the property, was entitled to express his opinion as to the value of the residence, and the district court could choose between competing valuations. See *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (when evidence is in conflict, appellate court considers, and may give weight to, fact that trial judge heard and observed witnesses and accepted one version of facts rather than another). See, also, *Thompson v. Thompson*, 18 Neb. App. 363, 782 N.W.2d 607 (2010) (owner of property entitled to express opinion as to value of residence, but trial court not required to accept owner's opinion; trial court made reasonable choice between competing valuations, and there was no basis to find error in acceptance of licensed appraiser's opinion of marital residence value). Thus, to the extent the court relied upon the values set forth in exhibit 111, the court's reliance upon Patrick's valuation of the marital home was not an abuse of discretion.

### (c) Premarital Assets

Kelly testified at trial that prior to her September 2002 marriage to Patrick she was employed by "HP," and she continued to work there until summer 2003. When Kelly left HP, she had shares of stock that she had acquired, and she still owned the stock at the time of trial. Prior to HP, Kelly worked for Boys Town and had accumulated some retirement benefits. After the parties married, those retirement benefits were rolled over into a Prudential IRA account; she denied

contributing any money to that account since the rollover and responded in the affirmative when asked if any additional value was the result of market fluctuations.

In addition to Kelly's testimony, exhibits relevant to the HP stock and Prudential IRA were received into evidence. Exhibit 42 is an "HP Inc. Common Stock" 2019 Dividends and Distributions Statement showing that Kelly had 146 shares and received dividends of $93.56 and $65.72. Exhibit 41 includes Prudential Financial documents for Kelly showing $8,686.88 in rollover IRA contributions in 2003. Exhibit 34 is a Prudential "Annuity Transaction Confirmation" for Kelly dated December 24, 2020, stating that the value for IRA account #3847 was $60,309.11; it also states the contract issue date was December 24, 2003.

Kelly wanted the district court to award her the HP stock and Boys Town retirement/Prudential IRA as premarital assets and she contends the district court abused its discretion by including those assets in the marital estate.

All property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to this general rule. *White v. White*, 304 Neb. 945, 937 N.W.2d 838 (2020). The marital estate does not include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property. *Id.* "Therefore, the original capital or value of an asset may be nonmarital, while all or some portion of the earnings or appreciation of that asset may be marital." *Id.* at 953, 937 N.W.2d at 846.

Accrued investment earnings or appreciation of nonmarital assets during the marriage are presumed marital unless the party seeking the classification of the growth as nonmarital proves: (1) The growth is readily identifiable and traceable to the nonmarital portion of the account and (2) the growth is not due to the active efforts of either spouse. *Id.* Appreciation caused by marital contributions is known as active appreciation, and it constitutes marital property. *Id.* Passive appreciation is appreciation caused by separate contributions and nonmarital forces. *Id.* The burden is on the owning spouse to prove the extent to which marital contributions did not cause the appreciation or income. *Id.*

Based on the record before us, this assignment of error is difficult to review on appeal because the district court did not include or incorporate a balance sheet in its decree. However, if as Kelly suggested at the hearing on her motion to alter or amend, exhibit 111 reflects the district court's balance sheet, then the court did give her some credit for premarital values of her HP stock and Boys Town retirement (Prudential Account #3847). The spreadsheet in exhibit 111 contains a section titled "Marital Property," which includes Hewlett Packard stock valued at $3,590 and a Prudential Annuity IRA (account #3847) valued at $60,309, both of which were assigned to Kelly. However, the bottom of the first page of the spreadsheet in exhibit 111 contains a section titled "Premarital Interest," which includes "HP Stock" valued at $1,730.10 and "Prudential IRA" valued at $8,687, both of which were assigned to Kelly. Accordingly, if, as Kelly suggested at the hearing on her motion to alter or amend, exhibit 111 reflects the district court's balance sheet, then the court did give her some credit for premarital values of those two assets. Specifically, regarding the Prudential IRA, Kelly received credit for $8,687, which was the same amount she rolled over during 2003, the year after the parties married. We cannot reconcile where the HP stock values in exhibit 111 came from; the only evidence in the record regarding the HP stock was the 2019

dividend statement showing that she owned 146 shares: there is nothing in the record to show when those shares were acquired, the value of the shares on the date of the marriage, or the current value of the shares.

Patrick contends, "if we assume that the District Court considered the values shown on Exhibit 111, the District Court did the right thing." Brief for appellee at 19. "Having been provided with evidence that the premarital assets increased in value, and no evidence that the increase was passive, all that it could do is subtract the premarital balance, and it appeared to do just that." *Id.* We agree. Accordingly, we find no abuse of discretion by the district court.

(d) Posttrial Evidence for Automobile

Kelly contends that the district court abused its discretion in not allowing Kelly to offer evidence posttrial concerning the fair market value of her automobile which model and value was inadvertently overstated at trial. At trial, Kelly testified that she owned a 2015 GMC Denali. Additionally, an exhibit received into evidence showed that the fair market value of a 2015 GMC Yukon Denali was $28,600 to $35,200 depending on the type of trade-in or retail. It was not until the hearing on her motion to alter or amend that Kelly's counsel informed the court that they were mistaken regarding Kelly's vehicle and that she really owned a Terrain Denali, not a Yukon Denali; counsel stated that the Terrain Denali was worth $13,000, whereas a Yukon Denali was worth $35,000. In its order on Kelly's motion to alter or amend, the court stated that Kelly sought to reopen the record because she mistakenly stated the model of her vehicle. It said, "This case was on file for more than three years before trial, and that mistake should have and could have been detected prior to trial, and [Kelly's] Motion to Reopen the Record should be denied."

Generally, a party cannot complain of error which the party has invited the court to commit. *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021). Because any error regarding the valuation of Kelly's vehicle is attributable to Kelly herself, the district court did not abuse its discretion when it declined to consider additional evidence or make an amendment to the decree regarding Kelly's vehicle.

(e) Patrick's Bonus and Rental Income

Kelly contends that the district court abused its discretion by not including in the marital estate Patrick's employer-provided bonus paid during the temporary period from separation to trial and the rental income collected by Patrick for that same period.

*(i) Bonus Income*

Patrick testified that he worked as a salesperson and earned a salary of $45,000 per year, was "guarantee[d] . . . $4,000 a month in commission for draw," and got paid quarterly bonuses based on his performance; he regularly received bonuses as part of his income. In 2020, Patrick's income was $225,000 in salary and bonuses.

Income earned from one or both spouses' employment during a marriage is a marital asset. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). Patrick's employment bonuses earned after the parties' separation in late 2018 were not earned during the marriage and were therefore not a marital asset to be included in the marital estate. Rather, his income, including bonuses, was relevant to determining temporary child support and alimony while the matter was

pending. Accordingly, there was no abuse of discretion by the district court as to this assigned error.

*(ii) Rental Income*

Shortly before their marriage, Kelly and Patrick decided to purchase their marital home. Kelly sold a home that she owned prior to the marriage to pay her half of the downpayment on the marital home. Rather than selling his premarital home, Patrick took out an equity loan on the home and used that money to pay his half of the downpayment on the marital home. His premarital home has been used as a rental property since the time of the parties' marriage. There was still a mortgage on the rental house at the time of trial. During the marriage, Patrick had an account at US Bank for money from the rental house. Patrick stated that approximately 6 months after Kelly filed for divorce, he closed the US Bank account and opened a Wells Fargo account for the rental house monies.

According to Patrick, the tenants' $1,300 monthly rent would cover the mortgage and interest-only equity line of credit which collectively totaled approximately $1,000 per month, and the rest of the rent money, approximately $300 per month, stayed in the rental account for rental property expenses. For example, an invoice dated June 11, 2013, was received into evidence, and showed that $9,300 was billed for work performed on the rental house (replacement of siding, garage door, and facia; roof repair, wrap of pillar in front of house). And a work order dated December 19, 2018, was received into evidence, and showed a total of $4,299 for windows to be installed at the rental house. When asked if it would be fair to say that generally he did not receive any additional income in any one year with respect to the rental property, Patrick responded, "No," "I put it back into the repairs on the house."

In her testimony, Kelly was "confused about the numbers" that Patrick gave for the $300 rental income, because when they started renting the property out, "every month we'd see . . . the $1,300, or whatever it was at that point in time, go into that account, then there would be a profit of [$]500, $600, and that continued to accrue monthly." Kelly did not believe that Patrick was accounting for all of the rental monies that he collected for "[m]ore than four years." She claimed she had "received not one dime in profit from the rental payments" for "years."

To the extent that the district court did not include rental income in the marital estate, we cannot say the court abused its discretion. There is evidence in the record that all income was put back into the property for repairs and other expenses, and according to Patrick, there was generally no additional income in any one year with respect to the property. Additionally, as with Patrick's bonus income discussed above, any net income generated by the rental property would have been a factor in considering temporary child support and alimony while the case was pending.

(f) Private School Tuition

Kennedy, age 17 at the time of trial, attended a private high school. Under the April 2019 temporary order, Patrick and Kelly were each ordered to pay a certain percentage of Kennedy's tuition; Patrick was to pay 75 percent and Kelly was to pay 25 percent. According to Patrick, between the filing of the divorce (November 2017) and the time of trial (February 2021), he used $10,000 from Kennedy's NEST account (funded with marital funds) to pay Kennedy's tuition. He

last took money ($5,000) from the NEST account to pay second semester tuition "last year." According to Patrick, the NEST account did not have any funds in it at the time of trial.

Kelly believes that she should get credit for 50 percent of the NEST funds that Patrick used to pay Kennedy's tuition, and she also takes issue with being ordered to pay an equal portion of Kennedy's ongoing tuition since Patrick earns substantially more income. We will address each argument in turn.

*(i) NEST Funds*

In its decree, the district court did not specifically address Patrick's use of the NEST funds to pay Kennedy's tuition, perhaps in part because there was limited evidence on this issue. The only evidence came through Patrick's testimony. He acknowledged using the NEST funds to pay $10,000 toward Kennedy's tuition from November 2017 to February 2021. Therefore, some of the NEST money was expended when the parties were still sharing expenses; the use of those funds to pay for Kennedy's tuition prior to the April 2019 temporary order can be attributed to both parents. However, Patrick did testify that he took $5,000 from the NEST account to pay tuition "last year," which would have been after entry of the April 2019 temporary order which created a 75 percent obligation for Patrick and a 25 percent obligation for Kelly. While we appreciate Patrick's suggestion that reconciling the amounts owed by each parent for their obligation toward Kennedy's tuition under the temporary order and final decree can be done outside of this appeal, we conclude that the more expedient resolution to address the NEST account is to simply allocate Kelly $2,500 for her one-half share of the $5,000 Patrick withdrew from the marital funds in the account following the entry of the April 2019 temporary order. The equalization payment should be adjusted accordingly.

*(ii) Ongoing Tuition*

The district court ordered each party to pay one-half of the ongoing tuition and other expenses necessary for Kennedy to attend her private high school until graduation. In the child support worksheet, Kelly was attributed a yearly income of approximately $53,560, and Patrick was attributed a yearly income of approximately $220,684. Kelly was awarded $3,000 per month in spousal support. Additionally, the parties have joint physical custody of Kennedy, and child support was determined accordingly. When child support is determined under a joint physical custody calculation, "all reasonable and necessary direct expenditures made solely for the child(ren) such as clothing and extracurricular activities shall be allocated between the parents, *but shall not exceed the proportion of the obligor's parental contributions* (worksheet 1, line 6)." Neb. Ct. R. § 4-212 (rev. 2011) (emphasis supplied). Pursuant to the district court's child support worksheet 1, line 6, Patrick had 77.29 percent of the parental support obligation and Kelly had 22.71 percent of the parental support obligation. Because Patrick is the obligor in this case, his portion of Kennedy's tuition could not exceed 77.29 percent, which it does not. The court had the discretion to order Patrick (the obligor in this case) to pay any portion of Kennedy's tuition, as long as his portion did not exceed 77.29 percent, which it did not. Given the overall financial circumstances of the parties, we cannot say that the court abused its discretion when it ordered each party to pay 50 percent of Kennedy's ongoing tuition.

(g) Equalization Amount

Kelly contends the district court abused its discretion when it unfairly denied Kelly a substantial or just result in the overall accounting and allocation of the marital assets and debts, resulting in material error with respect to the equalization amount to Kelly from Patrick.

As stated previously, the lack of a balance sheet in the decree made it difficult to review the parties' assigned errors. However, after reviewing all of Kelly's assigned errors above, we found no abuse of discretion by the district court, save for the court's failure to allocate $2,500 to Kelly for one-half of the NEST funds used by Patrick to pay Kennedy's tuition following the entry of the April 2019 temporary order.

3. PATRICK'S CROSS-APPEAL

On cross-appeal, Patrick claims the district court counted the downpayment on his new home twice. Again, the lack of a balance sheet in the decree makes this claim difficult to review. However, because this alleged error occurred in response to Kelly's postjudgment motion and reliance on exhibit 111, we likewise consider that exhibit to determine whether the district court erred in making an adjustment to Kelly's equalization amount.

In its decree, the district court ordered Patrick to pay Kelly an equalization payment of $60,000. However, at the hearing on Kelly's motion to alter or amend, she offered exhibit 111 as an aid to the court. Regarding exhibit 111, Kelly's counsel stated,

> [A]fter reviewing the decree, it's fairly obvious that what the Court did was to follow the decree that was submitted by [Patrick] in this case that was submitted to the Court, with the exception of the spousal support[.] . . . Although the Court did not include a spreadsheet attached, if you go down the spreadsheet for [Patrick] on their proposed decree, it pretty much is verbatim with regard to those items. So what I did with regard to the spreadsheet is I took the spreadsheet that was in the final decree, and that's on the left side . . . of my exhibit as an aid to the Court, and on the right side gave what I believe are the corrections based upon the testimony or based upon the argument I'm going to make today.

Essentially, Kelly claimed that her exhibit 111 was the balance sheet proposed by Patrick and used by the court in its decree, along with her requested corrections.

As relevant here, Kelly claimed that the parties had agreed that they were each going to "be responsible for and pay their own debts with regard to credit cards and things – and in regard to the installment debt obligations." Kelly argued to the district court that those debts "should not have been an offset against the marital estate." Among various credit card and other installment debts, a debt of $33,312 was indicated in Patrick's column for "US Bank Home Equity xxx577." Kelly claimed "there was $33,000 deducted against [Patrick's] equity in the marital estate for a loan which he agreed to assume and pay, . . . [a]nd . . . that [Patrick] said that [it] would not be a claim against the marital estate, that [it] was his obligation outside the marital estate and should not have been deducted." Kelly suggested that the installment debts should not have been included in calculating "the overall property division in this case." On the righthand side of exhibit 111, Kelly removed any deductions from each party's column for any such installment debts, including the US Bank Home Equity xxx577 debt for $33,312.

- 12 -

Patrick responded that while the parties "did agree that each party would pay their own debts," they did not necessarily agree that "these debts weren't going to be considered to be marital debts subject to being divided." The record supports Patrick's assertion. The bill of exceptions pages that Kelly directs us to in support of Patrick being willing to exclude the US Bank Home Equity debt from the marital estate do not support her argument. Although Patrick does agree that he will take "full and sole responsibility" for that debt, that he will indemnify and hold Kelly harmless as to that debt, and that it "is solely [his] debt" and "not any kind of claim against the family home," he never states that he should not get credit for taking responsibility for that debt.

While the focus, as pertinent here, at the hearing on Kelly's motion to alter or amend was on the US Bank Home Equity debt, the district court's September 17, 2021, order in response to Kelly's motion focuses instead on a different liability. The court appears to confuse Kelly's request regarding the US Bank Home Equity loan of $33,312 with a separate $33,522 loan taken by Patrick to purchase his new home. The order states:

> 6. [Kelly] argues that [Patrick] agreed to pay the debt for a $33,522 loan that was taken out of marital funds for a down payment on his new home. The court agrees that . . . half of this amount should be credited to [Kelly], and added to the $60,000 equalization amount." The court then amended the decree to reflect a modified equalization amount of "$76,761.00 from [Patrick's] Jackson National Life IRA."

The downpayment funds referenced by the district court were not raised as an issue in Kelly's motion to alter or amend. The record reflects that Patrick took $35,000 out of a Charles Schwab account (marital money) and used $33,522 of the money to make the downpayment on his current house; the remainder was used for other items. Patrick agreed that the $35,000 should be considered by the district court in determining an equitable division of the marital estate. Exhibit 111 shows that the $35,000 was in fact factored into the $60,000 equalization determination. Patrick filed a motion to alter or amend in an effort to correct this error, however the motion was denied.

On appeal, Patrick acknowledges that the record does not contain a balance sheet showing the district court's work but notes that he filed an exhibit attached to his motion to alter which was identical in substance to Kelly's exhibit 111. He then points out that exhibit 111 shows Patrick receiving $35,000 on his side of the ledger for his new home which he purchased with monies transferred from the parties' joint account. Despite this, the district court increased Patrick's property equalization payment by one-half of $33,522, which was the same amount as the downpayment on his house. Patrick claims that he already paid for the downpayment for his new home in the original division of property, "so he shouldn't have to pay for it a second time." *Id*.

In response, Kelly argues that "Patrick was allocated two distinct obligations which reduced his share of the marital estate as stipulated by the parties at trial," and thus "[t]he allocation of debts to Patrick was not remotely a double dip, as they pertain to two very separate financial issues." Reply brief for appellant at 4. First, Patrick withdrew $35,000 from the parties' Charles Schwab account to pay the downpayment on his new home. Second, Patrick took out a $35,000 second mortgage through US Bank on the parties' marital home.

We agree with Kelly that two distinct financial issues are involved. First, as previously stated, exhibit 111 shows Patrick receiving $35,000 on his side of the ledger for his new home

"purchased with monies transferred" from the parties' joint account. Second, exhibit 111 shows Patrick was responsible for the US Bank Home Equity loan in the amount of $33,312, and it was treated as a marital debt in the exhibit. At trial, Patrick testified that the home equity loan was used to refinance the equity line of credit on the rental house.

Based on our review of the record, including exhibit 111, it appears that the district court's original decree already included in its division of the marital estate the $35,000 of marital funds that Patrick used for the downpayment on his new house, as well as the $33,312 home equity loan allocated to Patrick as a marital debt. Accordingly, the court abused its discretion when it amended the decree to reflect that Patrick was to pay Kelly an equalization payment of $76,761. The equalization should have remained at $60,000, which we earlier modified to reflect a $2,500 adjustment needed to account for the $5,000 in NEST funds used by Patrick to pay Kennedy's tuition.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's decision, except that we find Kelly's equalization award should have been $62,500. Accordingly, we affirm the decision of the district court as modified.

AFFIRMED AS MODIFIED.